2006 OK CR 47

**Christopher Cornell ROY, Appellant**

v.

**STATE of Oklahoma, Appellee.**

**No. F–2005–611.**

Court of Criminal Appeals of Oklahoma.

Nov. 22, 2006.

---

David C. Phillips, Assistant Public Defender, Tulsa Public Defender's Office, Steve Kunzweiler, M. Sean Malloy, Assistant District Attorneys, Tulsa County D.A.'s Office, Tulsa, OK, attorneys for the State at trial.

Paula J. Alfred, Assistant Public Defender, Tulsa Public Defender's Office, Tulsa, OK, W.A. Drew Edmondson, Attorney General of Oklahoma, Sandra D. Rinehart, Assistant Attorney General, Oklahoma City, OK, attorneys for appellee on appeal.

## OPINION

CHAPEL, Presiding Judge.

¶ 1 Christopher Cornell Roy was tried by jury and convicted of First–Degree Murder, under 21 O.S.2001, § 701.7, in Tulsa County, Case No. CF–2004–1680. In accordance with the jury's recommendation, the Honorable Caroline E. Wall sentenced Roy to life imprisonment without the possibility of parole. Roy appeals his conviction and his sentence.

¶ 2 Around 7:15 a.m., on Wednesday, April 7, 2004, Sharon Mason went to the Tulsa apartment of her nineteen-year-old daughter, Monique Mason, to check on her. Although Sharon normally communicated with her daughter regularly, she had not heard from or seen Monique since March 30, 2004. When Monique did not answer the door, Sharon used her own key to unlock it. When she tried to push open the door, however, something was blocking it. When Sharon peered into the small crack in the door, she was horrified to discover that it was the body of her dead daughter that was blocking the door.

¶ 3 Monique Mason's body was wedged at the bottom of the staircase leading up into her apartment, with her head and upper

body toward the front door and her feet pointed up the stairs. She had been shot twice in the left side of the head. Her body was wrapped in a sleeping bag, with a clear plastic bag over her head and upper torso. Dr. Ronald Distefano, a medical examiner and forensic pathologist, testified that her death was caused by the bullet that penetrated her skull and lodged in her brain.[1] He estimated that she had been dead at least a day at the time her body was discovered, and possibly as much as two-and-a-half days. James Turner, who lived in the same complex, testified that he heard the sound of two gunshots around 10:15 p.m., on Monday, April 5, 2004.[2]

¶ 4 Christopher Cornell Roy had been dating Monique Mason for approximately two years prior to her death. Monique had recently resumed contact with Willie Hardman, her "first true love," however, and had informed Roy that their relationship was over.[3] Sharon Mason testified that Monique had become "weary" of the relationship with Roy and wanted to move on from it.[4] She testified that Roy called her at home in late March of that year and told her that he didn't want Monique to break up with him

and that he wanted to marry her.[5] Jayneice Oates, Monique's best friend, testified that Monique and Roy argued a lot and that in January of 2004, she witnessed Roy telling Monique that he would kill her if she tried to leave him, "because he would be damned if he spent two years of his life with her and she just leave." Oates testified that she heard Roy threaten to kill Monique on other occasions as well, and that Roy said he had a gun, though Oates never saw it.[6]

¶ 5 Claudia Plascencia, one of Monique Mason's neighbors, testified that she saw Roy leaving Monique's apartment on Thursday, April 1, and Sunday, April 4, 2004. On April 1st, she saw Roy coming out of Monique's apartment around 5:30 p.m., slamming the door and yelling angrily that he was going home. On April 4th, Plascencia arrived at the complex between 1:00 and 1:30 p.m. and walked past Roy as he walked away from Monique's apartment. Plascencia testified that Roy did not look at her and seemed "preoccupied." Another neighbor, Megin Secrist, testified that she heard a man and a woman arguing in Monique's apartment on Saturday, April 3. Sharon Mason testified that she saw Roy at church on Sunday, April

---

1. Dr. Distefano noted that there was no evidence of soot or stippling around the bullet wounds, which indicated that the shots were not fired from "close range," i.e., that the gun was at least one or two feet away at the time of the firings. He noted that the bullet that entered Monique Mason's left cheek lodged in soft tissue just in front of the spine and "really did not damage vital structures." He further testified, however, that the bullet that entered above her left ear perforated the brain itself and caused her death. Dr. Distefano testified that the two jacketed bullets he recovered were "small caliber," meaning smaller than .30 caliber.

2. Dr. Distefano agreed that his findings would be "consistent" with this testimony.

3. Various entries from Monique Mason's personal journal were entered into evidence at trial. These entries, beginning on March 23, 2004, detail how Monique had reconnected with Hardman, whom she described as her "first everything," "first true love," etc., through their classes at Tulsa Community College. Hardman had abruptly broken off their earlier relationship, in September of 2000, but the journal entries reveal that Monique was "still in love with him," despite the turmoil caused by that breakup. In a writing dated 11:00 a.m., March 25, 2004, on different paper, Monique wrote that Roy told her

he had read her journal and that he threatened to kill Hardman when he realized she was talking to him on the phone the previous night.

4. In a journal entry dated 4:50 p.m., March 25, 2004, Monique noted that she had broken up with Roy that day and that she was serious about ending that relationship, even if he didn't believe her. She wrote that breaking up with Roy was not about Hardman, but about learning to be truly independent: "I feel like I need to learn how to be alone and make it on my own."

5. Sharon Mason also testified that although Roy and her daughter argued a lot, she was not aware of any previous physical abuse in the relationship.

6. Sharon Mason testified that her daughter did not own a gun and would not have one in her apartment. Oates testified that Monique was afraid of guns and would not own one. Oates noted, however, that in January of 2004, Monique showed her a shoe box in her closet and indicated that it contained a gun, which did not belong to Monique. Oates was not allowed to "speculate" regarding the owner of the gun, since defense objections were sustained regarding this testimony.

4, at 1:45 p.m., but that Monique was not with him. She testified that she asked about Monique, and Roy indicated that he had not seen her for about two weeks, but that he thought she was in Oklahoma City. Sharon asked Roy to have Monique to call her if he talked to her, because she was very concerned about her daughter.

¶ 6 Brenda Roy, Christopher Roy's mother, testified that on April 7, 2004, as she was taking a friend's children to school, she saw the police, the local news, the coroner, *etc.*, all gathered around Monique's apartment. When she arrived back home, she woke her son, who lived with her, and told him that they needed to go see what had happened at Monique's apartment. Soon after Christopher Roy arrived at the scene, around 8:30 a.m., officers observed him sobbing and acting very upset, and learned that he was the victim's boyfriend. Sergeant Shawn King approached him and invited him to sit in his patrol car, attempted to calm him down, and asked Roy about his basic personal information (name, address, date of birth, *etc.*). King also asked Roy if he was willing to go down to the police department and make a statement, and Roy agreed to go.

¶ 7 Roy was brought to the police department and left sitting in the "bull pen," a work area shared by various officers, around 10:00 a.m. He was not handcuffed or otherwise restrained. Officer Stephen Colburn, a homicide detective whose desk was in this area, eventually spoke to Roy, got his basic information, and asked if he knew Monique Mason. Roy stated that they had been boyfriend/girlfriend, but that they were breaking up and that he had not seen Monique or been in her apartment for a couple of weeks. Roy also stated that Monique had started seeing her old boyfriend, whose name was "Willie."

¶ 8 Officer Roger Smith, the lead investigator in the case, arrived at the police department around noon that day and took Roy to an interview room, where he questioned Roy. Smith confronted Roy with some of the information being gleaned at the crime scene, such as the fact that he had been seen leaving Monique's apartment on multiple occasions within the previous week. During this conversation, Roy asked the question, "Would it be manslaughter if she came at me with a knife?". At that point Smith halted the interview, went and got Officer Jeffrey Felton to sit in on the questioning, began recording and videotaping the interview, and read Roy his rights under *Miranda,* using a Tulsa Police Department Notification of Rights form.[7]

¶ 9 After reading the fourth numbered right, that he had a right to have counsel appointed if he couldn't afford one, Roy asked, "Do I need a lawyer?". Rather than answering the question, Smith stated, "Hold on a minute," and continued reading the fifth and last right, about Roy's right to answer questions without a lawyer present and his right to stop answering at any time. Roy verbally acknowledged that he understood this right, as well as all of the rights that Smith had read, initialed each numbered right to indicate this understanding, and signed the waiver on the bottom of the form. He never inquired about or mentioned a lawyer again.

¶ 10 During the interview Roy stated that he and Monique had been arguing about money, bills, and their relationship. He stated that Monique was telling him to leave and that their relationship was over and that he was mad because he had just given her money. Roy also stated that Monique had given him a sexually transmitted disease, which she got from Willie. Roy indicated that he learned about the disease through pamphlets Monique had in her apartment, which said that you could not get rid of it. Later in the interview Roy stated that he knew he had the disease, though he had not yet been to a doctor, because he had had the rashes. He also indicated that he believed this sexually transmitted disease would prevent him from having children.

¶ 11 Regarding the shooting, Roy stated that he went into the bedroom in Monique's apartment and that she came in behind him with a knife in her hand. Roy stated that he

7. The videotape of this interview was admitted into evidence at trial. This recorded interview began at 2:50 p.m. and ended at 3:15 p.m.

bumped her as he came out of the bedroom and that she cursed him. Roy stated that he then grabbed the pistol, from either under the bed or in the closet, and they continued arguing in the living room. Roy stated that at some point Monique came at him with the knife, and he pulled the pistol out and "pop, pop. I went pop, pop just like that." Roy stated that he didn't aim, he just shot. He later confirmed that he fired twice and noted that Monique was facing the kitchen and he was facing the sliding glass doors when he shot her.[8]

¶ 12 Roy stated that he then picked up the knife and the gun and left. He said he threw the knife in the Arkansas River, around 71st Street, and he threw the gun into the river off the Bixby Bridge, going toward Haskell. Roy stated that he went back later that same day to take Monique to the hospital. He got some blankets and put her in a bag and put a clear trash bag over her, so he would not get blood in his mother's car. He explained that he had trouble getting her down the stairs, however, because "she was so heavy," and he basically dropped her and was unable to pick her back up or get her out of the house.[9] So he left. Roy stated that it all happened about a week-and-a-half ago and that he did not tell anybody. By this point in the interview, Roy was sobbing again.

¶ 13 Roy also stated that the knife Monique came at him with was a little steak knife with a brown handle. He described the gun as a "little revolver," either a .22 or a .25 caliber, which belonged to Monique. When asked about Monique's vehicle, which was missing, Roy stated that she had traded her Cavalier in for a black GMC Jimmy, but that he did not know where it was and that he did

not see it on the day of the shooting.[10] Roy believed the shooting had occurred on a Wednesday or Thursday and that he watched the NCAA "March Madness" basketball tournament with a friend on the following Friday and Saturday.[11]

¶ 14 Roy stated that he continued to call Monique's cell phone and that he left voicemail and text messages over the weekend, even though he knew she was dead. He acknowledged that he tried to clean up some of the blood on the couch cushions and the carpet, using water, before attempting to take Monique to the hospital. He stated, "Everything happened so fast man. Messed me up." At the end of the interview, in response to questions from Smith, Roy confirmed that he had not been promised anything, that no one had threatened him, and that he spoke to the officers of his own free will, because he wanted to tell the truth about what happened.

¶ 15 Later that same day Roy directed officers to the places where he claimed he had disposed of the knife and the gun, but they were never recovered.[12] Roy also directed officers to a Wal–Mart parking lot, to an area where he claimed he had burned the pair of gloves that he wore.[13] Although the officers did not find signs of a fire in that area, they did find two spent .22 caliber cartridge casings.[14]

¶ 16 Willie Hardman testified that he and Monique Mason had dated for five or six months while they were in high school and that they had recently gotten reacquainted at Tulsa Community College. Hardman noted that he knew Monique was dating a man

---

8. Photographs entered into evidence show substantial amounts of blood in the area described by Roy, both on the couch and on the floor below, and also on another couch in the living room.

9. Dr. Distefano testified that Monique Mason was 5 ft. 10 inches tall and weighed 214 pounds.

10. Monique Mason's black GMC Jimmy was discovered on April 14, 2004, by a security officer at a south Oklahoma City bingo establishment. Roy had been in custody since his arrest on April 7.

11. The exact date of the shooting remains unclear from the evidence presented at trial.

12. A dive team attempted to recover the gun from the area Roy indicated, but was unsuccessful.

13. Although no gloves were recovered, a search of Brenda Roy's Ford Focus, which Christopher Roy was allowed to drive, revealed a label from a pair of Boss jersey gloves, size men's large.

14. No casings were recovered at the scene, and Monique's apartment did not contain any other evidence associated with a gun or ammunition.

named Christopher Roy. Hardman testified that one afternoon while he was talking to Monique on the phone, Roy picked up and told Hardman that he had better not come around, that he shouldn't be talking to Monique, and that Roy would kill Hardman if he ever saw him. Hardman also testified that Monique came to his house on Saturday, April 3, and that she was excited about her new car.[15] Hardman testified that he spoke to her again on the phone that night and that she seemed scared. On Sunday, April 4, Hardman received a text message from Monique's cell phone, stating that Monique didn't want to talk to him anymore, that she wanted to be with Roy, and that she didn't care about him. Hardman testified that the message did not make sense to him, since he and Monique had been getting along. He was unable to reach her on that Sunday and Monday.

¶ 17 In Proposition I, Roy raises several challenges relating to the sentencing instructions given his jury. We take them up in turn. First, Roy challenges the following statement by the trial court, which was made during voir dire, as part of the court's introductory remarks to the initial panel of prospective jurors:

> Another instruction I will give is that as jurors if you find the defendant guilty, you will have the duty to assess punishment. The punishment for the crime of murder in the first degree is a possible maximum punishment of a term in the state penitentiary for life without parole and a fine of up to $10,000. If selected as a juror and upon a finding of guilt, will each of you assess punishment in accordance with the law?

Roy argues that this statement effectively prejudiced his jury panel, by not mentioning the lesser, authorized sentence of imprisonment for life, and thereby suggesting that the sentence of life without parole was the preferred penalty or more in accord with "the law."

¶ 18 The court's remarks are consistent with our uniform instructions for use by trial courts during voir dire.[16] Although the statement mentions only the maximum punishment for first-degree murder (in non-capital cases), we do not accept Roy's argument that it thereby prejudiced his jury toward this punishment or suggested that the maximum punishment was somehow "favored." This introductory instruction simply seeks to determine whether prospective jurors will consider sentencing the defendant to a term of imprisonment and a fine up to and including the maximum authorized sentence, if that sentencing question eventually comes before them. As Roy acknowledges, his jury was properly instructed, within the court's final and formal jury instructions, that first-degree murder is "punishable by imprisonment in the state penitentiary for Life or Life without Parole, and a fine of up to $10,-000."[17] Nothing in the record indicates that the jury interpreted the trial court's remarks in the manner suggested by Roy.[18] This claim is rejected accordingly.

¶ 19 Roy also notes, within Proposition I, that during its deliberations, his jury sent a handwritten note to the trial court asking as follows: "Are there guidelines in determining punishment in this case Life in Prison or Life in Prison with no parole?".[19] The trial court sent the following typed response: "YOU HAVE BEEN GIVEN ALL THE LAW AND EVIDENCE THAT IS

---

15. Hardman testified that he took a picture of Monique next to her new car that day, but acknowledged that he did not turn the picture over to the police; and no such picture was entered into evidence.

16. *See* OUJI–CR–1–5 (Supp.2005) (Question No. 12, for cases not involving the death penalty).

17. Since Roy's jury was also instructed regarding the lesser crimes of second-degree murder and first-degree manslaughter, his jury was likewise instructed regarding the applicable sentencing ranges for these crimes—with a sentencing range starting at four years for manslaughter.

18. In addition, the jury's note to the trial court, discussed *infra*, demonstrates that Roy's jury was considering both life imprisonment and life without parole in its actual sentencing decision.

19. The only other note sent by Roy's jury, which followed later, stated: "WE HAVE REACHED A VERDICT." The record in this case does not indicate how long the jury deliberated or the time at which the two notes were sent.

PROPER FOR YOU TO CONSIDER IN REACHING A VERDICT. PLEASE CONTINUE DELIBERATIONS." The trial transcript indicates that after Roy's jury announced it had reached a decision, but before the jury was brought back into the courtroom, the State asked to make a record about how this first jury note was handled. The State's lead prosecutor then explained that he was informed of the jury note and that the trial court intended to advise the jury that it had all the law and evidence that it needed, and that the State had agreed with this approach. Roy's defense counsel then stated as follows: "Likewise, your Honor, we received notification from your office of the note and the planned response by the Court and understood and agreed with the Court's response."

■ ¶ 20 Roy now attempts to construe the jury's note seeking "guidelines" for its punishment determination into a question about the meaning of "life." Roy also attempts to "supplement the record" in a way that suggests—despite the above-quoted statement of his counsel—that defense counsel objected to the trial court's response to the jury's note.[20] This Court finds that the language of the jury question reveals that the jurors were looking for guidance regarding their difficult choice between sentencing Roy to life or life without parole, for the first-degree murder of Monique Mason. The meaning of the jury question was plain to the parties and the trial court, which explains why they were all in agreement that it could not be answered. The trial court was correct to simply refer the jury back to its instructions, since the difficult question of "how do we decide?" was, under the law, simply unanswerable.

¶ 21 The real focus of Roy's Proposition I claim is that the trial court failed to instruct his jury regarding the "85% Rule," in accord with our decision in *Anderson v. State*.[21] Of course *Anderson* was not decided until eight months after Roy's trial, and Roy's counsel failed to offer an instruction referring to the 85% Rule and also failed to object to the jury instructions used at trial on this basis.[22] Hence we review the trial court's failure to instruct regarding the 85% Rule for plain error.

¶ 22 This Court's recently published opinion in *Carter v. State*[23] notes that despite certain language in *Anderson*, "this Court has nevertheless applied *Anderson* in cases pending on direct review at the time *Anderson* was decided to determine whether relief in the form of modification or re-sentencing [is] warranted."[24] We also noted in *Carter* that "[a] violation of *Anderson* is a type of instructional error," which must be evaluated to "determine whether the error resulted in a miscarriage of justice or consti-

---

**20.** On January 19, 2006, Roy tendered for filing with this Court a "Second Motion to Supplement and Application for Evidentiary Hearing on Sixth Amendment Claims," attaching an affidavit from his trial counsel dated 1/18/2006. Under our Rule 3.11, such supplementation is only allowed when an ineffective assistance claim "is predicated upon an allegation of failure of trial counsel to properly utilize available evidence or adequately investigate to identify evidence which could have been made available during the course of the trial ...." Rule 3.11(B)(3)(b), Rules of the *Oklahoma* Court of Criminal Appeals, Title 22, Ch.18, App. (2006). This rule does not authorize a supplementation that attempts to establish that defense counsel objected to an action of the trial court, when such an objection is not documented in the official record of the case—particularly when the trial transcript indicates that defense counsel stated that he "agreed with" the trial court's action, and particularly when no one suggests that the transcript is inaccurate. This Court sees no reason to "supplement the record" with the proffered recollection of counsel. Hence Roy's **SECOND MOTION TO SUPPLEMENT AND APPLICATION FOR EVIDENTIARY HEARING,** tendered for filing on January 19, 2006, is hereby DENIED.

**21.** 2006 OK CR 6, 130 P.3d 273 (holding that jurors should be instructed regarding the "85% Rule," contained within 21 O.S.2001, §§ 12.1 & 13.1, for crimes falling within this rule).

**22.** Roy's trial was completed on June 15, 2005; *Anderson* was decided on February 22, 2006.

**23.** 2006 OK CR 42, 147 P.3d 243.

**24.** *Id.* at ¶ 4, 147 P.3d at 244. The *Carter* opinion cites *Griffith v. Kentucky*, 479 U.S. 314, 323, 107 S.Ct. 708, 713, 93 L.Ed.2d 649, for the proposition that "failure to apply a new rule of criminal procedure to cases pending on direct review when the rule is announced violates a basic norm of adjudication." *Carter*, 2006 OK CR 42, ¶ 4, 147 P.3d at 244 (citing *Griffith* ).

tutes a substantial violation of a constitutional or statutory right." [25]

¶ 23 In the current case, as in *Anderson* and *Carter*, the jury sent a note to the trial court indicating that the jury was struggling with the decision about whether to sentence the defendant to imprisonment for life or to life without parole.[26] Admittedly, as noted above, the question in this case was not specifically asking about when a person sentenced to "life" could first be eligible to be considered for parole. Nevertheless, the question indicated that Roy's jury was, quite reasonably, looking for information and guidance in its assigned task—once the jury had determined that Roy was guilty of first-de-

gree murder—to make the very difficult choice about whether to sentence this man to "life" or to "life without parole." Although the very fact that the two sentences are presented as different options logically implies that the sentence of simply "life" must include the possibility of parole at some point, knowing at what point such parole would be legally available is certainly critical to making the choice between these two options.[27]

¶ 24 We feel confident that Roy's jury would have been aided in its sentencing determination by being instructed regarding the 85% Rule and its impact on a sentence of imprisonment for "life." [28] More important-

---

**25.** *Id.* at ¶ 5, 147 P.3d at 244 (citing 20 O.S.2001, § 3001.1 and *Ashinsky v. State*, 1989 OK CR 59, ¶ 20, 780 P.2d 201, 207). Beyond Carter, the significance of our Anderson decision is further attested by our recently published decision in *Ferguson v. State*, 2006 OK CR 36, 143 P.3d 218, in which we vacated the conviction of a defendant who pled *nolo contendere* to first-degree rape—two years prior to our decision in *Anderson*—because the defendant was not informed, at the time of his plea, about the impact of the 85% Rule for his parole eligibility on his agreed-upon sentence.

**26.** In *Anderson*, the jury "sent out a note asking how many years had to be served before a person was eligible for parole." 2006 OK CR 6, ¶ 10, 130 P.3d at 278. In Carter, the jury sent out a note asking: "Can you clarify life? What is the minimum # of years served before coming up for parole?". 2006 OK CR 42, ¶ 5, 147 P.3d at 244.

**27.** In *Mayes v. State*, 1994 OK CR 44, 887 P.2d 1288, this Court recognized the change brought about by the advent of "life without parole" as a sentencing option in first-degree murder cases:

By its actions, the Legislature has created a specialized area of the law which mandates the jury must consider the possibility of parole in determining whether a defendant convicted of first degree murder must live or die.... [I]f the Legislature did not want a jury considering parole, it would not have included the term in a sentencing option.

887 P.2d at 1316. In Mayes and many of the cases relied upon by the State on appeal, this Court addressed the issue of jury questions and instructions regarding the meaning of a life without parole sentence. See, e.g., *id.* at ¶¶ 126–37, 887 P.2d at 1316–18; *Murphy v. State*, 2002 OK CR 24, ¶¶ 48–52, 47 P.3d 876, 886, partial postconviction relief granted on separate issue, 2002 OK CR 32, 54 P.3d 556. And this Court has repeatedly stated that "the meaning of life without parole is self-explanatory and that an instruction on its meaning is not required." See, e.g.,

*Murphy*, 2002 OK CR 24, ¶ 52, 47 P.3d at 886 (citing cases).

Yet when a jury is given "life without parole" and "life" as two different sentencing options, the jury is implicitly being instructed that a sentence of "life" does not really mean imprisonment for the defendant's natural life. Hence the jury is implicitly being informed that the term "life" in this context does not have its traditional, plain-language meaning, and such a jury is naturally left wondering what the term means. Since the sentence of "life" is contrasted with the sentence of "life without parole," a jury should reasonably infer that the sentence of simply "life" must include the possibility for parole at some point. Yet the jury is left wondering, "but when?".

In *Mayes*, we acknowledged that at the time of that decision, Oklahoma law did not have a specific statute limiting the availability of parole for a defendant sentenced to "life" for first-degree murder. 1994 OK CR 44, ¶ 133, 887 P.2d at 1317 (contrasting Oklahoma with other states and noting that "Oklahoma does not have a specific parole provision for defendants given life sentences for first degree murder"). This Court's decision in Anderson recognized that the adoption by our Legislature of the 85% Rule, see 21 O.S.Supp.1999, §§ 12.1, 13.1, for crimes committed on or after March 1, 2000, changed this reality in our State. See *Anderson*, 2006 OK CR 6, ¶ 13, 130 P.3d at 278 ("Therefore, this Court should modify our previous rulings and recognize that for cases covered by this new sentencing reality[,] ... the legislature's specific action compels a specific limitation on our traditional prohibition of mentioning parole at trial."). Hence this Court reasonably concluded, in *Anderson*, that a jury should be instructed regarding the meaning of the term "life," within this new sentencing reality. We decline the State's request to revisit or reverse *Anderson*.

**28.** This Court in no way suggests that a jury is entitled to be provided with all the information

ly, considering this case as a whole,[29] we cannot feel confident that Roy's sentence was not impacted by the "rounding up" phenomenon noted in Anderson, where jurors who are worried about a defendant being released on parole "too quickly," essentially "round up" the defendant's sentence "in an attempt to account for their uninformed guesses about the impact of parole."[30] While it remains difficult, if not impossible, to determine with certainty whether such "rounding up" occurred in any particular case, the vast experience of this Court in reviewing jury sentences—particularly in cases where a jury question about the impact of parole went unanswered—leaves us with the solid conviction that the rounding up problem is real and that it often significantly impacts the length of a defendant's sentence.

¶ 25 This Court finds that, under the specific facts of this case, the trial court's failure to instruct Roy's jury regarding the 85% Rule may well have resulted in a miscarriage of justice. Roy, like the defendant in Carter, was a young man at the time he committed the offense of first-degree murder.[31] Roy had no prior offenses, and his shooting of Monique Mason—though undoubtedly unjustified, inexcusable, and tragic—was clearly related to Roy's emotional reaction to being "dumped" by a woman for whom he cared. While Roy's jury reasonably determined that

his emotional state did not undermine the gravity of his crime,[32] this Court finds that the combination of Roy's age, his lack of criminal history, and his emotional state could possibly have persuaded Roy's jury to sentence him to simply "life," if his jury had known that with such a sentence, Roy still would not become eligible for parole for 38 years and 3 months. In other words, under the facts of this specific case, a sentence of life without parole was not "inevitable" or even nearly so.

¶ 26 We do not here find that the trial court's failure to instruct regarding the 85% Rule, standing alone, constituted plain error. Rather, we find that the cumulative effect of the court's failure to instruct regarding the 85% Rule, after the question from Roy's jury, and in combination with the potential impact of the prosecutor's improper closing arguments, leaves us "in grave doubt that the lack of an instruction clarifying the meaning of life imprisonment and the effect of the 85% Rule prejudicially impacted the sentencing deliberations" of Roy's jury.[33] Under these circumstances, this Court finds that Roy should be granted sentencing relief.

¶ 27 In Proposition II, Roy alleges that his trial counsel was constitutionally ineffective. Roy claims that his counsel was ineffective for: 1) failing to object to the prosecutor's

that would "aid" it, or even that a jury should necessarily be told about any other aspects of the way actual time served on a jury's sentence could be impacted by future events. As explained in Anderson, "the 85% Rule is a legislatively-imposed restriction upon executive branch discretionary authority," which makes it unique. 2006 OK CR 6, ¶ 16, 130 P.3d at 279. This mathematical rule is statutorily based; it applies only to specifically enumerated offenses; it is not discretionary; it is not subjective; it does not depend on any future events or decisionmaking; and it is a concept that non-lawyers can readily understand and apply. Although calculating 85% of 45 years, or of any other number, may require some basic math, it is certainly within the collective competence of a jury. See id. at ¶ 23, 130 P.3d at 282. And under our new uniform instruction, cases involving a potential sentence of imprisonment for life will be specifically informed that a sentence of "life" will be treated like a sentence of 45 years and that 85% of 45 years amounts to 38 years and 3 months. See OUJI–CR 2d 10–13B (Supp.2006).

29. In particular, as noted in Proposition V, this Court finds that the cumulative impact of the failure to instruct regarding the 85% Rule and the prosecutorial misconduct noted in Proposition III merits sentencing relief in this case.

30. See Anderson, 2006 OK CR 6, ¶ 23, 130 P.3d at 282.

31. Carter was 17 years old; Roy was 26 years old. In Carter, this Court recognized that a defendant's young age could make a jury more willing to consider a sentence of simply "life"—particularly if the jury had already asked a question indicating that it was struggling with the sentencing decision—if such a jury understood the impact of the 85% rule on a life sentence. 2006 OK CR 42, ¶ 6, 147 P.3d at 245.

32. Roy's jury was instructed regarding second-degree murder and first-degree manslaughter, but chose to find him guilty of first-degree murder.

33. Carter, 2006 OK CR 42, ¶ 7, 147 P.3d at 245.

improper presentation of victim sympathy evidence and argument; 2) failing to object to the prosecutor's improper presentation of character evidence; 3) failing to properly respond to the jury's question · seeking "guidelines"; 4) failing to properly preserve the issue of prosecutorial misconduct; and 5) failing to request an instruction regarding the 85% Rule. In order to establish ineffective assistance of counsel, Roy must establish that his counsel's performance was deficient and that he was prejudiced by counsel's failure to perform adequately.[34]

¶ 28 In this section, Roy simply restates claims made elsewhere in his brief—casting the claims as ineffective assistance claims, in an attempt to avoid the problem of waiver.[35] This Court will address Roy's first and second ineffective assistance claims within its discussion of Proposition III. Roy's fourth claim simply combines claims one and two and need not be separately addressed. And this Court's resolution of Proposition I effectively renders moot Roy's third and fifth claims of ineffective assistance. Hence this Court need not decide whether counsel's failure to seek an instruction regarding the 85%

Rule constituted ineffective assistance.[36] We do not here further address Proposition II.

¶ 29 In Proposition III, Roy argues that the prosecutors in his trial committed prosecutorial misconduct by: (1) attempting to evoke sympathy for the victim and her family, (2) introducing irrelevant character evidence and making improper character arguments, (3) attempting to shift the burden of proof to the defendant, and (4) implying that they represented the victim's family. Relief will be granted on a prosecutorial misconduct claim only where the prosecutor committed misconduct that so infected the defendant's trial that it was rendered fundamentally unfair, such that the jury's verdicts should not be relied upon.[37] Such claims are evaluated within the context of the entire trial.[38]

¶ 30 For his first example of an improper appeal to sympathy for the victim and her family, Roy selects a statement made by the prosecutor during voir dire, noting that Sharon Mason, who was in the courtroom, was "the mother of a real human being who died." Yet this statement, which is barely prejudicial even standing alone, is entirely appropriate when considered in context.[39] The prosecutor was simply emphasizing that

---

**34.** *See Williams v. Taylor,* 529 U.S. 362, 390–91, 120 S.Ct. 1495, 1511–12, 146 L.Ed.2d 389 (2000); *Strickland v. Washington,* 466 U.S. 668, 686–87, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984).

**35.** Throughout his brief and within his various appellate motions, Roy repeatedly restates, in identical and unabbreviated form, claims made elsewhere. This is unhelpful to the Court.

**36.** On April 7, 2006, Roy tendered for filing with this Court a "Third Motion to Supplement and Application for Evidentiary Hearing on Sixth Amendment Claims," attaching two affidavits. As noted supra in 20, Rule 3.11 only allows for such supplementation when the proffered materials support a claim that trial counsel failed to investigate or properly utilize "available evidence" during the defendant's trial. See Rule 3.11(B)(3)(b), *Rules of the Oklahoma* Court of Criminal Appeals, Title 22, Ch.18, App. (2006). This rule allows limited supplementation of *evidence* that could have been offered at trial. It does not provide a method for attempting to establish that trial counsel was delinquent for failing to request a particular jury instruction. Hence Roy's **THIRD MOTION TO SUPPLEMENT AND APPLICATION FOR EVIDENTIARY HEARING** is hereby **DENIED.**

**37.** *See Donnelly v. DeChristoforo,* 416 U.S. 637, 645, 94 S.Ct. 1868, 1872, 40 L.Ed.2d 431 (1974) (consider whether challenged conduct made trial "so fundamentally unfair as to deny [defendant] due process"); *Darden v. Wainwright,* 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986); *see also Spears v. State,* 1995 OK CR 36, ¶ 60, 900 P.2d 431, 445 (citing cases).

**38.** *See DeChristoforo,* 416 U.S. at 639, 94 S.Ct. at 1869 (reviewing court evaluates "whether [prosecutor's] remarks, in the context of the entire trial, were sufficiently prejudicial to violate [the defendant's] due process rights"); *Darden,* 477 U.S. at 179, 106 S.Ct. at 2470.

**39.** One prospective juror had stated that he was writing a book, specifically, a western. The prosecutor responded: "Okay. Anybody up here read books? Okay. All right. Right over there is a real human being accused of a crime. Right over there is the mother of a real human being who died. This is not a book or a magazine." He also noted that "it's reasonable to expect that decisions made by human being should have consequences decided by human beings."

the issues before the jury were real, not fiction, and that everyone involved—the defendant, the victim, the victim's mother, and even all the jurors—were real people, not fictional characters. This unremarkable point was neither improper nor prejudicial to Roy.

¶ 31 Roy also challenges the State's elicitation of "sympathy testimony" from Sharon Mason about the fact that her daughter had been studying early childhood development and was trying to decide whether she wanted to work with children as a counselor/therapist or in a preschool setting. Roy likewise challenges the State's elicitation of testimony from Sharon Mason about her own diagnosis with cancer and her subsequent surgery, prolonged hospital stay, chemotherapy, and radiation treatments, in the early months of 2004. Sharon Mason testified that at the time she discovered her daughter's body, she had not yet been released to drive. Defense counsel failed to object to any of this testimony.[40] When the State attempted to elicit further testimony about how Monique had been helping Sharon during this time, Roy's counsel objected that the testimony was irrelevant, but the court allowed the State to "link up" this evidence, through testimony about when Sharon last spoke with her daughter.

¶ 32 This Court finds that Sharon Mason's brief testimony about what her daughter was studying and her career plans, though not particularly relevant, was not very prejudicial either. We reach the same conclusion regarding Sharon Mason's testimony about her battle with cancer. Although most of this testimony was irrelevant to the question of whether Roy murdered Monique Mason, this background information was not particularly prejudicial to Roy, which is probably why his counsel did not object to it initially.[41] We conclude that the State's elicitation of this testimony did not constitute prosecutorial misconduct, and also that defense counsel's failure to object to this testimony did not

constitute ineffective assistance of counsel, because the challenged testimony was limited, was not very emotional, and was not likely to have any effect on the jury's determinations regarding Roy.

¶ 33 Roy also challenges the lead prosecutor's closing argument, in which he directly contrasted the character of the victim with the character of the defendant. On appeal, Roy challenges the first portion of this argument, describing Monique Mason, as an improper appeal to victim sympathy; and he challenges the second portion of the argument, describing Roy, as an improper attack on the character of the defendant. The prosecutor stated as follows:

As we listened to the evidence and as it was presented in this case, ladies and gentlemen, I submit to you that you can glean from this evidence and learn about the character of an individual

So I submit to you, what do we know of the character of Monique Mason? We know that she's a 19 year-old young woman, striving for her independence in a world that is just opening up for her. We know that she is a young woman who has the courage to move out of her home into her first apartment in January of 2004.

We know she is a young woman whose bedroom is adorned with stuffed animals. We know she is a young woman who works for a living. We know she is a young woman who goes to college to improve herself. We know that she is a young woman who wants to be a counselor for children. We know that she is a young woman who is thoughtful and reflective about her life.

We know that she is a young woman who is looking for the love of her life. And we know that she is a young woman who is struggling to make decisions which will affect her future. And then we know this, ladies and gentlemen, we know that she is a young woman whose final resting place is

---

**40.** The first part of Roy's first ineffective assistance claim (Proposition II) is based upon defense counsel's failure to object to this testimony. The second part of his first claim—challenging the prosecutor's closing argument use of this evidence—is addressed *infra*.

**41.** The evidence about Sharon Mason being unable to drive at the time of Monique's murder was relevant, since it helped establish the timeline of Sharon's final contacts with her daughter.

the only apartment she ever rented. Where she was head-first and jammed up against the door at the bottom of a stairwell encased in a sleeping bag and shrouded in a plastic garbage bag.

What do we know of the character of Christopher Roy? We know he's a 26 year-old man living in the home of his mother and uncle. We know that he is a person who is capable of concealing from his own mother and his uncle that he has murdered another human being.

At this point defense counsel objected.

¶ 34 When the parties convened at the bench, the trial court, without even waiting to hear the nature of defense counsel's objection, informed the prosecutor that he was "not allowed to attack the character of the defendant." When the prosecutor tried to defend his argument, saying, "I'm attacking the character—I'm saying you can use—," the trial court cut him off and ordered him not to use the word "character." The prosecutor agreed not to use that word and continued as follows:

We know that he is capable of sleeping on the floor next to his mother with this dark secret. We know that he has the capacity to arrive at the very scene of his homicidal act and feign ignorance and emotion in the face of his mother, his uncle, the police department, the fire department, the coroner's office, news media, medical personnel, and bystanders.

We know that Mr. Roy is a person who can sit down at a desk with a law enforcement officer and be untruthful about the last time he saw Monique alive. We know that he is a person who's willing to undertake efforts to conceal his crime in the hope that he will never be linked to her death or possibly her disappearance.

We know that he is a person who threatens to kill people if they do not do as he says.

At this point defense counsel objected that the State was relying on "facts not in evidence." The trial court overruled the objection. The prosecutor continued:

We know that he is a person who acts upon his threats from this evidence. What else do we know about Mr. Roy from the evidence? What else? We know that he is a person who has no qualms about leaving a young, career-oriented daughter of a mother at the bottom of a stairwell with two bullets in her head and a plastic garbage bag shrouding her lifeless body.

The prosecutor then moved on to a summary of how the elements of first-degree murder were met in the case.

¶ 35 On appeal Roy challenges the prosecutor's description of Monique Mason as an improper appeal to victim sympathy and also asserts that defense counsel's failure to object to this characterization constitutes ineffective assistance of counsel.[42] Roy challenges the prosecutor's contrast of his character with that of his victim as an improper character argument. And he also challenges the failure of defense counsel to "keep this prejudicial [character] evidence out or alternatively to preserve the issue for appellate review." [43]

¶ 36 This Court finds that although the evidence relied upon by the prosecutor in his description of Monique was either properly admitted or not particularly prejudicial (and not objected to), the prosecutor's use of this evidence in his closing argument was improper and potentially prejudicial.[44] The prosecutor's argument sounds like a victim impact statement in a capital case. Yet this is not a capital case, and Oklahoma law does not allow for such descriptions of the victim in non-capital cases.[45] The jury's job was to deter-

42. This is the second part of Roy's first ineffective assistance claim in Proposition II.

43. This challenge constitutes Roy's second ineffective assistance claim in Proposition II.

44. Some of the evidence cited by the prosecutor, such as the fact that Monique Mason was going to school, was based upon admissible testimony. Other evidence cited, such as the fact that Mo-

nique had stuffed animals in her room and was "looking for love in her life," was reasonably based upon properly admitted exhibits, namely, a videotape of the crime scene and her journal.

45. While Oklahoma law and federal constitutional law allow the State to present victim impact testimony, during a capital sentencing, that gives the jury "a quick glimpse" of the life of the victim, to demonstrate the victim's "unique char-

mine whether Roy was criminally responsible for the death of Monique Mason and, if so, to sentence him accordingly.[46] The prosecutor's description of the noble character of the victim could reasonably be expected to be unfairly prejudicial to the jury's task regarding Roy.[47]

¶ 37 This Court finds that the prosecutor's argument was an improper appeal to victim sympathy and that Roy's counsel should have objected to this argument.[48] Nevertheless, standing alone, we would not grant relief regarding this argument, since this Court does not find that this brief victim sympathy argument, by itself, would have made Roy's trial unfair or the jury's verdicts in his case unreliable.[49]

■ ¶ 38 The more significant misconduct and greater potential for prejudice occurred when the prosecutor then specifically and deliberately contrasted the "character of Christopher Roy" with the "character of Monique Mason." An improper character argument could hardly be more blatant than specifically contrasting the "bad character" of the defendant with the "good character" of the victim.[50] Defense counsel properly objected when the prosecutor began directly attacking the "character of Christopher Roy," and the trial court sustained the objection. However, the trial court's admonition,

"Please don't use the word character," missed the point and effectively allowed the prosecutor to continue with his character argument, sans the actual word "character."

¶ 39 This Court rejects Roy's claim that the *evidence* relied upon by the prosecutor to attack his character, *i.e.*, that he was not working, lived with his mother, had threatened people in the past, *etc.*, was improperly admitted. Roy fails to establish that any of this evidence should have been excluded, since all of this evidence was linked to the actual crime on trial and the events surrounding its discovery and investigation.[51] Nevertheless, the fact that evidence was properly admitted does not justify every conceivable *use* of this evidence in the State's arguments to the jury.

¶ 40 In *Malone v. State*,[52] this Court noted as follows:

> Certain evidence that may be in fact "mitigating" or "aggravating" will inevitably be introduced throughout any trial, although that evidence is admitted to prove the elements of the crime, to support a legal defense, or to impeach a witness.... But a criminal trial is not to be based upon so-called "character" evidence, and the same principle applies to [non-capital] sentencing proceedings.[53]

acteristics" and show "why the victim should not have been killed," *see, e.g., DeRosa v. State,* 2004 OK CR 19, ¶ 77, 89 P.3d 1124, 1151 (citing cases), *cert. denied,* 543 U.S. 1063, 125 S.Ct. 889, 160 L.Ed.2d 793 (2005); *Payne v. Tennessee,* 501 U.S. 808, 822–25, 111 S.Ct. 2597, 2606–08, 115 L.Ed.2d 720 (1991), such testimony has no place and no legal basis in non-capital cases.

46. The State makes little attempt to defend the prosecutor's description of Monique, arguing simply that the evidence cited "was relevant to establish the defendant's motive for killing Monique." Yet the record in this case does not support the assertion that Monique's admirable characteristics were the reason, or any part of the reason, that Roy killed her.

47. *See, e.g. Jones v. State,* 1987 OK CR 103, ¶ 17, 738 P.2d 525, 529 ("[T]his Court has repeatedly held that it is improper for a prosecutor to ask jurors to have sympathy for crime victims." (citing *Tobler v. State,* 1984 OK CR 90, ¶¶ 16–17, 688 P.2d 350, 354)).

48. Hence this Court finds that Roy has established inadequate performance in this regard.

49. Hence we find that Roy has failed to show "prejudice" on his ineffective assistance claim regarding this evidence and that his second Proposition II claim fails accordingly.

50. *See generally* 12 O.S.2001, § 2404; *see also Burks v. State,* 1979 OK CR 10, 594 P.2d 771 (establishing standards for admission of "other crimes" evidence under § 2404(B)), *overruled in part on other grounds in Jones v. State,* 1989 OK CR 7, ¶ 8, 772 P.2d 922, 925; *Freeman v. State,* 1988 OK CR 192, ¶¶ 2–9, 767 P.2d 1354, 1355–57 (holding that prohibitions of § 2404(B) and *Burks* apply equally to evidence that "stigmatizes" the defendant, though it does not establish a separate crime, if the "other acts" evidence is unrelated to the crime at issue).

51. Roy's second ineffective assistance claim in Proposition II fails accordingly.

52. 2002 OK CR 34, 58 P.3d 208.

53. *Id.* at ¶ 8, 58 P.3d at 210.

This Court finds that the prosecutor's deliberate and explicit contrast of the victim's character with that of the defendant was blatant prosecutorial misconduct. Thus this Court concludes that Roy has established prosecutorial misconduct regarding the State's appeal to victim sympathy and its attack on the defendant's character.

¶ 41 Nevertheless, we find that the specific character argument complained about by Roy on appeal—namely, the fact that he lived with his mother and did not work—had very limited prejudicial impact.[54] While Roy describes these facts as "stigmatizing," this Court does not agree that such evidence is the type of character evidence that is inherently inflammatory or that might reasonably be expected to render a defendant's murder trial unfair or a jury's sentence unreliable.[55] In a first-degree murder case such as Roy's, the limited "stigma" associated with being an unemployed adult living with one's mother could not reasonably be expected to have any impact on a jury's determination of guilt or its selection of a sentence. And we do not think that this argument, standing alone, would have affected the jury's determinations in this case.[56]

¶ 42 Consequently, we would not grant Roy any kind of relief solely on the basis of his Proposition III prosecutorial misconduct claim, and we are confident that the complained-of misconduct had no impact on the jury's determination of Roy's guilt. Nevertheless, as noted earlier, this Court does conclude that the cumulative effect of this prosecutorial misconduct and the trial court's failure to properly inform Roy's jury regarding the 85% Rule, particularly after the jury's "guidelines" note, necessitates the granting of sentencing relief in this case.[57]

¶ 43 Before moving to Proposition IV, we must also address the third and fourth prongs of Roy's Proposition III prosecutorial misconduct claim. In the third prong of this claim, Roy alleges that the prosecutor attempted to "shift the burden of proof" to the defendant. In his closing argument discussion of the elements of first-degree murder, the prosecutor stated: "The death was unlawful. Ladies and gentlemen, I submit to the jury there's been no evidence presented to this jury to show to you that there was any lawful cause." Defense counsel objected that the State was "shifting the burden," and the trial court sustained the objection and admonished the jury. The prosecutor continued:

> I have to prove an element that shows that the death was unlawful. And certainly I'm not shifting the burden to the defendant to say that they have to show—but what evidence have you seen in this case, ladies and gentlemen, in its total that shows that this was a lawful death? I submit to you, you don't have that.

Defense counsel did not object to this further elucidation of the State's argument.

¶ 44 This Court finds that even though the trial court sustained defense counsel's initial objection, the prosecutor's argument did not improperly attempt to shift the burden of proof to the defendant. Proving the second element of first-degree murder, that the death was "unlawful," often flows from a lack of evidence (or unconvincing evidence) suggesting that there was some lawful justification for the killing, such as self-defense. In essence, this element requires the State to "prove a negative," i.e., that there was no

---

54. Hence our description of the misconduct as "blatant" is based upon the fact that the prosecutor's comparison of the "characters" of the victim and the defendant was explicit and not at all subtle—rather than a finding that this misconduct was alarmingly prejudicial.

55. *Cf. Dunkle v. State*, 2006 OK CR 29, ¶¶ 24–50, 139 P.3d 228, 237–46 (reversing first-degree murder conviction based upon improper admission of irrelevant and unduly prejudicial character evidence, including evidence that defendant practiced witchcraft, and improper prosecutorial reliance upon and emphasis of this evidence).

56. Thus we reject Roy's prosecutorial misconduct claim regarding this particular character argument, since Roy fails to establish that this particular argument, standing alone, rendered his trial unfair or his sentence unreliable. We note that Roy does not challenge the prosecutor's attacks on his character that followed the trial court's admonition about the word "character."

57. Thus we are granting relief on Roy's Proposition V cumulative error claim.

lawful justification for the killing. In this context, it is not improper, nor does it shift the burden of proof, for the State to argue that the lack of evidence of a lawful cause should lead the jury to conclude that the victim's death was "unlawful." The prosecutor never argued that the defendant had failed to produce evidence or to prove something that he was required to prove. This Court concludes that the prosecutor's argument was not improper and that it did not attempt to shift the burden of proof.[58]

¶ 45 In his fourth and final prosecutorial misconduct claim, Roy challenges the following remark in the State's final closing argument: "Mr. Kunzweiler, Detective Smith, the victim's family want to thank you for your time and your patience."[59] Roy argues that the prosecutor is implying that he represents the victim's family. Roy notes that the challenged remark parallels a remark we found improper in *DeRosa v. State*.[60] This Court again finds, as we did in *DeRosa*, that such remarks are improper, because they suggest that the State represents victims and the families of victims, and because it is an improper attempt thereby to align the State with victims and their families.[61] Nevertheless, we also find, as we did in *DeRosa*, that this singular remark does not constitute plain error, nor could it be reasonably expected to have any impact on the fairness of Roy's trial or the determination of his sentence.

¶ 46 In Proposition IV, Roy argues that the videotape of his confession should have been suppressed, because he asked whether he needed an attorney and because his confession was coerced. A *Jackson/Denno* hearing was held on Roy's suppression motion on May 24, 2005, before the Honorable Caroline E. Wall, where both of these issues were addressed.[62] At the conclusion of the hearing, the trial court denied Roy's motion to suppress.[63] This Court must now determine whether the trial court's decision to admit the evidence of Roy's statements to the police "is supported by competent evidence of the voluntary nature of the statement[s]."[64]

¶ 47 In addition to presenting the videotape of Roy's confession at the suppression hearing, the State also elicited testimony from Officers Roger Smith and Jeff Felton about what happened that day.[65] Officer Smith testified that Roy showed no signs of being affected by drugs or alcohol and that Roy indicated he had reached the eleventh grade in school. Smith testified that until Roy asked the question about whether it would be manslaughter if the victim came at him with a knife, he was free to go, but that Roy was not free to go after that point, which was why Smith Mirandized him. Smith testified that just before Roy made the manslaughter statement, he had encouraged Roy that "if he was responsible, he needed to be man enough to stand up and take responsibility for his actions." Officers Smith and Fel-

---

58. This Court notes that, in fact, some evidence was presented to the jury that the victim's death was "lawful," in the form of Roy's videotaped statement about Monique Mason coming at him with a knife. And Roy's jury was instructed on the elements of self defense. Nevertheless, the strategy of Roy's counsel at trial was to profess Roy's innocence and treat his confession as coerced. Hence defense counsel did not argue or assert that the victim's death may have been "lawful," and Roy could not have been prejudiced by the argument of the prosecutor.

59. Defense counsel did not object to this remark; hence we review it only for plain error.

60. 2004 OK CR 19, ¶ 60 n. 110, 89 P.3d 1124, 1146 n. 110 (addressing the statement, "Now, on behalf of the family and the State of Oklahoma, I want to say thank you for your jury service.").

61. *Id.* at ¶ 60, 89 P.3d at 1146.

62. *See Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964) (establishing defendant's right to *in camera* hearing to determine voluntariness of a confession).

63. While the trial judge stated that it would be a "better practice" for officers to cease interrogating a defendant who asks whether he or she "needs an attorney," the court recognized that this is not legally required.

64. *Davis v. State*, 2004 OK CR 36, ¶ 34, 103 P.3d 70, 80 (citing *Bryan v. State*, 1997 OK CR 15, ¶ 17, 935 P.2d 338, 352).

65. This Court's summary of what happened during the videotaped portion of Roy's interrogation, both at the beginning of this opinion and in this section, is based upon the actual videotape.

ton testified that they did not threaten, make promises, or in any way coerce Roy into talking with them.[66]

¶ 48 Christopher Roy testified at the suppression hearing and asserted that at some point before the videotaped interview, two other officers came and got him and took him into a different interview room.[67] Roy testified that these two officers "threatened" him and that one of them "got in [his] face," slammed his hands on the table, and told Roy that he knew Roy had killed Monique and that he was going to get "life or the death penalty" for it. Roy also testified that the officers told him that if he confessed, he would not get the death penalty. Roy then added that the officers threatened that "they were going to stick me and hide me or whatever," which Roy interpreted as a threat to kill him.

¶ 49 Roy did not offer any evidence to corroborate his testimony that he was improperly threatened by the unnamed officers, however, or that the encounter described ever even occurred. Officer Smith testified, in rebuttal, that although he came out of the interview room various times to get updates on Roy's case, he never left the area and that no one else ever entered the interview room where Roy was waiting. This Court notes that at the end of the videotaped interview, Roy states that he was not threatened or promised anything regarding his statement,

that he was acting on his own free will, and that he made the statement because he wanted to tell the truth.[68]

¶ 50 We begin by addressing the significance of Roy's question to Officer Smith, "Do I need a lawyer?", which Smith never answered. We conclude that, under well-established caselaw, this question does *not* constitute the kind of unequivocal request for counsel that would have required the interrogation of Roy to be terminated.[69] This challenge is rejected accordingly.

■ ¶ 51 This Court also concludes that the trial court acted properly in denying Roy's motion to suppress the videotape. The record strongly supports the trial court's determination that Roy's confession was voluntary. Evaluating Roy's statements within the totality of the circumstances, we agree with the trial court's finding that the confession was voluntary.[70] Despite Roy's testimony at the suppression hearing, the record amply supports the trial court's determination that his confession and waiver of his rights was "the product of a free and deliberate choice rather than intimidation, coercion, or deception." [71] Proposition IV is rejected accordingly.

■ ¶ 52 In Proposition V, Roy asserts that cumulative error rendered his trial unfair and his sentence of life without parole

---

66. All of the officers who testified at Roy's trial likewise testified that they never threatened, coerced, or made any promises to Roy during their dealings with him.

67. Roy testified that he did not know the officers' names, but he gave a physical description of them both. Roy acknowledged that he was not threatened by either Smith or Felton.

68. Roy notes in his brief that he put on evidence at trial that a nurse, who assisted in booking him into the county jail later that day, noted that Roy was complaining of hearing voices, that some of them were good and some were bad, and that Roy was contemplating suicide and was placed on a suicide watch. This evidence was not introduced at Roy's suppression hearing, however; so we do not consider it in our evaluation of the trial court's denial of his suppression motion. Roy's jury was exposed to this evidence, however, and was able to consider it as part of its determination about whether Roy's confession was voluntary.

69. In *McHam v. State*, 2005 OK CR 28, 126 P.3d 662, the defendant testified that after being read his *Miranda* rights, he stated: "This is a murder case. Don't I need a lawyer?". The defendant further testified that the interviewing officer responded, "No, they'll just tell you not to answer any questions." *Id.* at ¶ 29, 126 P.3d at 671–72. Our *McHam* opinion held that even if this exchange occurred as described, the defendant's question did not constitute an "unequivocal request for counsel"; hence the interviewing officer was not required to stop questioning him. *Id.* at ¶ 30, 126 P.3d at 672 (relying upon *Davis v. United States*, 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994)). The current case is squarely covered by the rule formulated by the Supreme Court in *Davis* and applied by this Court in *McHam* and other cases.

70. *Davis*, 2004 OK CR 36, ¶ 33, 103 P.3d at 80.

71. *Id.* (citations omitted).

unreliable. This Court concludes that any errors committed during Roy's trial, even considered cumulatively, did not render his trial, as a whole, unfair, nor did they impact Roy's conviction for the first-degree murder of Monique Mason. As summarized earlier, however, this Court does find that, under the specific facts of this case, the trial court's failure to instruct Roy's jury regarding the 85% Rule and its impact on a "life" sentence, after the jury's note seeking sentencing "guidelines," and in combination with the prosecutorial misconduct found in Proposition III, necessitates the granting of sentencing relief in this case.

## Decision

¶ 53 Christopher C. Roy's **CONVICTION** for First–Degree Murder is **AFFIRMED.** His **SENTENCE** of Imprisonment for Life Without Parole, however, is **REVERSED,** and this case is **REMANDED FOR RE-SENTENCING.** Pursuant to Rule 3.15, *Rules of the Oklahoma Court of Criminal Appeals,* Title 22, Ch.18, App. (2006), the **MANDATE** is **ORDERED** issued upon the delivery and filing of this decision.

C. JOHNSON and A. JOHNSON, JJ.: concur.

LUMPKIN, V.P.J. and LEWIS, J.: concur in results.

LUMPKIN, Vice–Presiding Judge: Concur in Results.

¶ 1 I concur in the results of this opinion but write separately to address certain issues. The Court has improperly embellished and unnecessarily emphasized certain allegations of error in an attempt to create a precedent setting opinion when in reality this opinion adds nothing to our jurisprudence and is easily addressed on settled case law.

¶ 2 Appellant's claim of error regarding the court's response to the jury's question is reviewed for plain error only as there were no objections to the court's response. The record reflects the jury simply asked, "are there guidelines in determining punishment in this case Life in Prison or Life in Prison with no parole". (Court's Exhibit, Tr. 1359). The plain language of the question reveals there was no inquiry regarding the "meaning of Life or parole." In his brief, Appellant argues the "trial court should have instructed the jury in the difference between life and life without parole by telling the jurors that 'life without parole' means the defendant will not be eligible for parole if he is so sentenced". (Appellant's brief, pg. 14). To state, as this opinion does, that this allegation is an attempt to construe the jury's note into a question about the meaning of life is an unwarranted embellishment on Appellant's claim of error.

¶ 3 The claim of error raised in the appellate brief is easily answered by settled case law. As the question was basically unanswerable under the law, the trial court properly referred the jury back to their written instructions. *See Littlejohn v. State,* 2004 OK CR 6, ¶¶ 10–11, 85 P.3d 287, 293–94. Therefore, no plain error occurred. Instead of simply answering the allegation as raised in the brief, the opinion refashions Appellant's arguments in an attempt to address the "merits" of an issue which otherwise would be waived.

¶ 4 This refashioning of the argument raised on appeal continues throughout the first proposition of error. Appellant's claim regarding the absence of an instruction on the 85% Rule is merely one part of the first proposition; it is not the "real focus" of the proposition. Under the principle of *stare decisis,* I agree that *Anderson* applies in this case. Any questions regarding the applicability of *Anderson* have been resolved by our recent decision in *Carter v. State,* 2006 OK CR 42, 147 P.3d 243.

¶ 5 The analysis used in this case to determine whether the *Anderson* error is harmless utilizes a standard not previously used or adopted by this Court (the failure to instruct on the 85% Rule "may well have resulted in a miscarriage of justice"), and makes assumptions not based on the evidence (that "a sentence of life without parole was not 'inevitable' or even nearly so".) Much of what passes for analysis on this issue is purely filler not necessary to the holding of the case. Or, like 28, an attempt to legislate a sentence rather than enforcing the properly enacted

sentence established by the Oklahoma Legislature.

¶ 6 In Proposition III, addressing claims of prosecutorial misconduct, Appellant cites no legal basis nor is any apparent to support his conclusion that the use of properly admitted evidence in closing argument can be improper or potentially prejudicial. In fact, closing argument is the proper place to discuss evidence that has been admitted during the trial and apply that evidence to the instruction of the law given by the trial judge. While a conviction cannot be based upon character evidence alone, see *Malone v. State*, 2002 OK CR 34, ¶ 8, 58 P.3d 208, 210, properly admitted evidence can be used in the closing argument and relied upon by the jury in determining a verdict.

¶ 7 After a thorough review of the briefs and record, I find certain comments made during the second stage closing argument combined with particular facts of the case warrant remanding the case for resentencing.