2008 OK CR 19

**Jeremy Alan WILLIAMS, Appellant**

v.

**The STATE of Oklahoma, Appellee.**

**No. D 2006–338.**

Court of Criminal Appeals of Oklahoma.

June 25, 2008.

⌐960

Creekmore Wallace, Carla Root, Sapulpa, OK, attorneys for defendant at trial.

Tim Harris, District Attorney, Doug Drummond, William Musseman, Assistant District Attorneys, Tulsa County, Tulsa, OK, attorneys for the State at trial.

William H. Luker, Traci J. Quick, Capital Direct Appeals Division, Indigent Defense System, Norman, OK, attorneys for appellant on appeal.

W.A. Drew Edmondson, Attorney General of Oklahoma, Jennifer J. Dickson, Assistant Attorney General, Oklahoma City, OK, attorneys for appellee on appeal.

## *OPINION*

LEWIS, Judge.

¶1 Appellant, Jeremy Alan Williams, was charged on June 25, 2004, in Tulsa County District Court Case number CF–2004–2805, with, count one, First Degree Murder, with alternative theories of malice murder or felony murder, in violation of 21 O.S.2001, § 701.7(A) and (B), count two, Robbery with Firearms, in violation of 21 O.S.2001, § 801, and counts three and four, Shooting with Intent to Kill, in violation of 21 O.S.2001, § 652(A).[1] On October 29, 2004, the State filed a Bill of Particulars alleging three aggravating circumstances: (1) the defendant created a great risk of death to more than

---

**1.** Williams was charged conjointly with Alvin Jordan and Christopher Jordan in counts one and two; and conjointly with Alvin Jordan in counts three and four. A fourth person, Dyra Malone, was charged with Accessory after the

Fact in count five of the Information. Later, Tommy Doyle was also charged as an accessory after the fact, but his charges were subsequently dismissed.

one person; (2) the murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution; and (3) the existence of a probability that the defendant will commit criminal acts of violence that would constitute a continuing threat to society. 21 O.S.2001, § 701.12(2), (5), and (7).

¶ 2 Williams' case was severed from his codefendants for jury trial which commenced on February 21, 2006, and concluded on March 6, 2006, before the Honorable Tom C. Gillert, District Judge. The jury found Williams guilty of all four counts and assessed punishment at fifteen (15) years on count two and life imprisonment on counts three and four. At the conclusion of the second stage of trial, the jury found the existence of two aggravating circumstances, continuing threat and great risk of death to more than one person, and set punishment at death. Judge Gillert formally sentenced Williams in accordance with the jury verdict on March 20, 2006, ordering that the terms be served consecutively. Thereafter, Williams perfected his appeal to this Court.[2]

## I. FACTS

¶ 3 On June 22, 2004, the First Fidelity Bank in Tulsa, Oklahoma was robbed by armed gunmen wearing hooded sweatshirts and stocking caps with crudely cut eyeholes. During the robbery a customer and two employees were shot. One of the employees died as a result of her gunshot wound.

¶ 4 At about 9:15 a.m. the two gunmen entered the bank. The first was a black person who was wearing a black-hooded sweat shirt, a ski mask, gloves, and black shoes. He was also carrying a silver revolver. The other gunman was wearing a white-hooded sweatshirt and a ski mask. He was carrying a black semi-automatic pistol. The white-hooded gunman went to the teller area where he told the teller to empty the cash drawers. He also told bank manager Mark Poole to open the safe, but Poole explained

that they were on a time delayed system and would not open for fifteen minutes after the combination was entered.

¶ 5 The black-hooded gunman went to a back office and forced Josh Robey and Shelley Hopper down the hall to the teller area. In the mean time, a customer, Howard Smith, had entered the bank. He saw the gunman wearing the light-colored sweatshirt standing behind the counter. He was oblivious to black-hooded gunman standing behind him. As he was raising his arms, the black-hooded gunman shot him.

¶ 6 The black-hooded gunman then went behind the teller area and, as the white-hooded gunman was arguing with Poole, the black-hooded man shot Poole. Then the white-hooded man shot Poole a second time. Both Smith and Poole survived and testified at trial.

¶ 7 As the two men left the bank, they both turned around. The white-hooded man fired a shot which struck teller Amber Rogers, resulting in her death. Another bank employee, Donnie Cox, heard the commotion and saw what was going on. He was able to get to the stairway, go downstairs, and call 9-1-1.

¶ 8 At around 9:15 a.m. Sandra Simmons, who was outside in the parking lot, saw a white sports car that reminded her of a Camaro or Firebird leaving the parking lot. This car had damage to the right front fender. She could not see inside the car because it had dark tinted windows.[3] This car, as well as several other pieces of evidence presented by the State, proved that Williams was involved in the robbery, and that he was possibly the gunman wearing the black-hooded sweatshirt. This evidence included (1) Williams' confession to witness Beverly Jordan that he shot some people and that they divided the money; (2) Williams' possession of a large sum of cash after the bank robbery; (3) Williams' admitted ownership of

**2.** Appellant's Petition in Error was filed in this Court on September 12, 2006. Appellant filed his brief on March 19, 2007. The State filed its response brief on August 14, 2007. The case was submitted to the Court August 21, 2007. Appellant's reply brief was filed September 4, 2007. Oral argument was held February 26, 2008.

**3.** Simmons could not positively identify a photograph of Appellant's car, as she thought the damage was on a different area of the right front fender.

the firearms used in the robbery: (4) Williams' statement to Dyra Malone that he "jacked" a white man; (5) Williams' DNA found on a dark blue stocking cap used in the robbery; (6) a shoe print left at the scene that matched the black shoes Williams was wearing when arrested; and (6) Williams' admission that he robbed the same bank a few weeks earlier and had transacted business at the bank before that.

¶9 Williams and the co-defendants had discussions about this prior robbery and discussions about a future robbery. The details of the prior robbery were that on May 11, 2004, this same bank was robbed by a black man wearing a hooded sweatshirt, baseball cap, sunglasses, and a dark T-shirt pulled over his mouth. This robber carried a dark colored semi-automatic pistol. Williams was linked to this robbery because he left fingerprints on an envelope at the bank. The fingerprints were not matched until Williams was arrested for this second robbery and murder. Williams admitted he committed the first robbery, but not the robbery, shootings, and murder that serves as the basis for the case at bar. He testified that, during the first robbery, he jumped from the second floor onto the first floor so that he would not have to wait for the elevator. After this robbery, Williams told his friends that he successfully robbed the bank.

¶10 Phala Owens, codefendant Alvin (Tony) Jordan's girlfriend, testified that, sometime before June 14th, Williams told Alvin Jordan and Chris Jordan about committing this earlier robbery in May while they were all at her apartment at Crystal Bay.[4] The three gentlemen were sitting on the balcony and Owens was inside when she overheard them planning to rob a bank which was on the second floor of a building.

¶11 At a later date, but before June 14, Owens was with the group at a condominium

Williams shared with his girlfriend, Dyra Malone. She accompanied Alvin Jordan to the condo. Alvin told her that Williams had some new pistols that he wanted to see. During a conversation between Alvin Jordan and Williams, Williams said he would kill if he had to. Owens saw two pistols, one of them was the silver revolver labeled as State's exhibit 85. She could not describe the other pistol.

¶12 The night before the murder, Williams, Alvin Jordan and Christopher Jordan were together at Tarina Clark's apartment.[5] Sometime after 4:00 a.m. the three left the apartment. Williams testified that he was extremely drunk and high. After the robbery occurred, Williams was seen dropping off Alvin and Chris Jordan at Beverly Jordan's house.[6]

¶13 When he dropped them off, Beverly Jordan needed money for gas, so Alvin Jordan pulled out a wad of cash and gave her some money. Williams drove Beverly Jordan to the convenience store, so she could put gas in a container. On the way to the store, Williams skidded through a stop sign and hit a passing car. The passing car did not stop, but Tulsa police officer Mark Kennedy, who was driving an unmarked car, saw the accident and stopped Williams. Williams received three tickets and the officer told Beverly Jordan that she had to drive, because Williams had no valid license.

¶14 After they went to the convenience store, Williams told Beverly Jordan that he shot some people and that they divided the money. He got $1100, Alvin Jordan got $1100 and Chris Jordan got $700. He then took Beverly Jordan home. Williams denied making this statement to Jordan.

¶15 Officer Mark Kennedy, who stopped Williams that morning, testified that the stop occurred at 10:30 a.m. He conducted a pat down of Williams and felt a large bulge in his

---

4. The June 14 date is significant because on June 14, Alvin Jordan and his brother, Claude Jordan, robbed a convenience store near the Crystal Bay apartments. A couple of people were shot. Owens was driving the vehicle involved in this robbery. The next time Owens saw Alvin Jordan was after the bank was robbed on June 22. Williams' defense, while not specific, seems to imply that Alvin Jordan and possibly Claude Jor-

dan committed the second robbery after Williams told them about the bank.

5. Tarina Clark was another girlfriend of Alvin Jordan.

6. Beverly is Christopher's mother and Alvin's aunt.

pocket. He reached inside the pocket and pulled out a wad of money. Williams explained to Mark Kennedy that he had just sold a car.

¶ 16 That afternoon, Beverly Jordan took Alvin Jordan to the store where he bought an Xbox video console with a wad of cash. Later she took him to a motel. On cross-examination she testified that the day before the robbery, Alvin Jordan told her that he planned to rob a bank. She knew that he had shot two people at Ryan's convenience store a few days earlier, and she tried to talk him out of robbing the bank.

¶ 17 Phala Owens heard a news report about the robbery, so she called Alvin Jordan. That evening, she went to a motel room where Alvin Jordan was staying and they had sex. She testified that Jordan had an Xbox video console at the motel. While she was there the police came. Alvin told her to put $805.00 cash in her pocket and he flushed marijuana down the toilet and went outside where he was arrested.

¶ 18 Dyra Malone, Williams' girlfriend testified that she saw Williams at about 11:00 a.m. on the day of the robbery. He told her that he got three tickets and he was being followed. He pulled out two wads of money from his pocket and said he "jacked" a white man. He gave her $250–300 for rent and he told her to put it away.

¶ 19 They then drove around in Williams' white Camaro, paid some bills, bought a kitten at a pet store, went to a park and smoked marijuana. They then went to a vacant house where they had sex. After sex, Malone went out to get some tissues from the car. When she came back in, Williams was bringing in a mask from the backyard. The mask contained three pistols. She identified the silver revolver [7] and a black semi-automatic pistol.[8] She had seen both of these guns before at their condo.

¶ 20 Malone testified that on the Thursday before the robbery, she had kicked Williams out of the condo, and he came back and stole all of her property, including a $6000 big screen television. When Williams testified, he claimed the money in his pocket came from the sale of this television.

¶ 21 Williams admitted to committing the May 11 robbery with the unloaded black .40–caliber semi-automatic pistol, which Malone had viewed. He told Alvin Jordan about the robbery. He said that he was extremely drunk when he left Tarina Clark's apartment at what could have been 4:00 a.m. The next thing he knew he was being jostled by Alvin Jordan trying to wake him up. He was at a vacant house owned by Earlene Hughes. Alvin was carrying a stocking cap with guns.

¶ 22 This dark blue stocking cap was later discovered, along with three guns in a vehicle parked in the driveway of Earlene Hughes's vacant house. The guns included the .45–caliber silver revolver, the black .40–caliber semiautomatic pistol, and a .25 caliber semiautomatic pistol. Officers also found, in this car, another blue stocking cap, a gray stocking cap, a white T-shirt, and one round of ammunition. All of the stocking caps had homemade eyeholes cut into them, just like the masks worn by the robbers of the bank.

¶ 23 Another stocking cap was found in a dumpster near this vacant house. Eye holes had been cut in this stocking cap. This stocking cap contained the DNA of Chris Jordan. The gray stocking cap found in the car contained the DNA of Alvin Jordan. The stocking cap that contained the guns had DNA from both Williams and David Hughes. This stocking cap belonged to David Hughes, the son of Earlene Hughes, who had stored it, along with some other items, at his mother's vacant house. The DNA expert concluded that Williams was a major contributor and Hughes was a minor contributor. The other blue stocking cap found in the car contained DNA, but all persons of interest in this case were eliminated as donors.

¶ 24 The .45–caliber revolver contained three spent cartridges and three live cartridges in the cylinder. The .40–caliber had seven live rounds, one in the chamber and six in the magazine.

¶ 25 Some .40–caliber cartridge casings were found inside the bank. These were

---

7. State's exhibit 85.

8. State's exhibit 88.

matched to the found .40–caliber semi-automatic pistol. A .45–caliber bullet was recovered from the wall of the bank. Several other bullet fragments were recovered, and while none of bullet evidence could be positively matched to the firearms, the calibers were consistent. A shoe print was found on the counter at the teller area where the black-hooded gunman had jumped over the counter. This print matched the design on the shoes Williams was wearing when he was arrested.

## II. JURY SELECTION ISSUES

¶ 26 In proposition two, Williams claims that the trial court erred when it failed to remove two jurors for cause. Williams complains about jurors R.J. and M.B. Potential Juror R.J. had an experience with crime, which according to Williams, would adversely affect his ability to be fair and impartial. Potential Juror M.B., according to Williams, doubted her ability to remain attentive during the trial. The trial court refused to remove these two potential jurors for cause, and Williams was forced to remove them with peremptory challenges. Williams expended all of his peremptory challenges, and he argues that he was forced to keep two unacceptable jurors, because of the trial court's failure to remove R.J. and M.B. for cause.

■ ¶ 27 We review the manner and extent of a trial court's *voir dire* under an abuse of discretion standard. *Littlejohn v. State*, 2004 OK CR 6, ¶ 49, 85 P.3d 287, 301. As the trial court personally observes the jurors and their responses, this Court will not disturb its decisions absent an abuse of discretion. *Eizember v. State*, 2007 OK CR 29, ¶ 42, 164 P.3d 208, 222; *see Uttecht v.*

*Brown*, 551 U.S. ——, 127 S.Ct. 2218, 2224, 167 L.Ed.2d 1014 (2007) ("deference to the trial court is appropriate because it is in a position to assess the demeanor of the venire, and of the individuals who compose it, a factor of critical importance in assessing the attitude and qualifications of potential jurors"). An abuse of discretion has been defined as "any unreasonable, unconscionable and arbitrary action taken without proper consideration of the facts and law pertaining to the matter submitted." *Harvey v. State*, 1969 OK CR 220, ¶ 9, 458 P.2d 336, 338. *See Stouffer v. State*, 2006 OK CR 46, ¶ 60, 147 P.3d 245, 263 (holding that an abuse of discretion is a clearly erroneous conclusion and judgment, which is clearly against the logic and effect of the facts presented.)

■ ¶ 28 Juror R.J. indicated that his mother had been strangled and killed in her own home, during a robbery in Brownsville, Texas, just a month prior to the start of this trial. He indicated his mother's murder would not affect his position in this case. He told defense counsel that it "won't play any part." Counsel requested that R.J. be removed for cause because counsel believed that despite his comments, the murder of his mother would affect him during this trial. The trial court denied counsel's request.

¶ 29 Williams cites *Hawkins v. State* 1986 OK CR 58, 717 P.2d 1156 and *Rojem v. State*, 2006 OK CR 7, 130 P.3d 287, to support his position.[9] In *Hawkins*, a Grady County DUI prosecution, the prospective juror's father had been killed by a drunk driver, and the juror was also married to a Grady County sheriff's deputy. In *Rojem*, a resentencing for crimes involving the kidnapping, rape and murder of a seven year old girl, the prospective juror's daughter had been molested by

9. Appellant also cites the unpublished case of *Davidson v. State*, Case No. F–2002–1437 (Okl. Cr. Apr. 28, 2004 not for publication). Counsel states that *Davidson* is the only case where the sole reason for removal for cause was the juror's personal experiences with a related crime. In both *Hawkins* and *Rojem*, there were other reasons that required removal for cause. In *Davidson*, this Court, with three judges concurring in result, held that where a venire man was being questioned for service in a lewd molestation trial, the venire man's admission that she had been repeatedly molested by her stepfather for many

years, "an allegation disturbingly similar to the claims in this case" was sufficient cause to have her removed, despite her statement that she could put her own experiences aside. *Slip Opinion* at 3. She stated that her victimization had never been effectively resolved by her family or by the legal system, but she insisted that she could be fair. We held that despite her claims, the danger was too great that she could not set her personal experience aside. This Court resolved the issue by finding that the error was not properly preserved by trial counsel, thus waived. *Id. Slip opinion* at 6.

the prospective juror's husband (the daughter's stepfather), and the prospective juror's husband had been prosecuted by the same prosecutor in the case for which she was called for jury duty. By Appellant's own admission, *Hawkins* and *Rojem* are distinguishable. Furthermore, we find that the trial court did not abuse its discretion.

¶ 30 Here, R.J. was not personally involved in the crime. This prospective juror had no connections to either the prosecution or defense. The crime against his mother (home invasion) and the present crime (bank robbery) are not similar. Therefore, we cannot find that the trial court abused its discretion in failing to remove R.J. for cause.

■ ¶ 31 Juror M.B., according to Williams, had other things on her mind which would cause her to be inattentive to the trial proceedings. M.B. stated that her son was getting married the following week, on Saturday March 4 (M.B. was questioned on Wednesday, February 23, trial started the next day) and she had commitments and responsibilities in planning for that event. She stated that she had things to plan in the two days before the wedding and she might be pre-occupied during those days. M.B. also indicated that her mother had been assaulted and robbed in her home, several years before. M.B. indicated she could separate that incident from the current case, because she knew Williams was not responsible for that crime; however, because of that crime and the upcoming wedding, she would be thinking more about her, now deceased, mother, but she could put the crime aside. M.B. also indicated that Mr. Wallace, Appellant's trial attorney once represented her in child custody proceedings ten years prior, but it would not affect her in deciding this case.

¶ 32 The trial court ruled, after counsel asked that she be removed for cause, that M.B. said that she could not be totally attentive "on Thursday and Friday and whether we're here is a matter of speculation. So that is not a reason for cause." Under an abuse of discretion standard, we cannot find that the trial court's decision to refuse to

remove M.B. for cause was an erroneous conclusion, which was clearly against the logic and effect of the facts presented.

¶ 33 We find that the trial court did not abuse its discretion in failing to remove either of these jurors; therefore, there is no need to address whether Williams was entitled to more peremptory challenges.

## III. FIRST STAGE ISSUES

### A.

¶ 34 In proposition one, Williams claims that the trial court erred when it allowed the State to introduce evidence of the prior robbery occurring on May 11.[10] He argues that the trial court's reason for allowing this evidence—proof of identity—was not a valid reason for inclusion. He claims that the differences between the methods of operation in the two robberies are far more numerous than the similarities. Thus, he concludes that the evidence was inadmissible, other than to merely show Williams is guilty of another crime, which is prohibited.

¶ 35 The State argues that evidence of the prior robbery was necessary to prove the identity of Williams as one of the robbers in the instant offense. The State argues that there was sufficient connection between the two crimes to make evidence of the first robbery admissible for the purposes set forth in 12 O.S.2001, § 2404(B).

■ ¶ 36 This Court's review of a trial court's decision to allow the introduction of "other crimes" evidence is based on an abuse of discretion standard. *Eizember*, 2007 OK CR 29, ¶ 99, 164 P.3d at 234. The general rule is that, when an accused is placed on trial, he is to be convicted by evidence that shows him guilty of the offense charged and not of other offenses not connected with the charged offenses. Evidence that a defendant committed other crimes, however, is admissible to show motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident. *Lott v. State*, 2004 OK CR 27, ¶ 40, 98 P.3d 318, 334; *Welch v.*

---

10. The trial court gave the uniform jury instruction on other crimes evidence along with the other jury instructions at the conclusion of the evidence.

*State,* 2000 OK CR 8, ¶ 8, 2 P.3d 356, 365; 12 O.S.2001, § 2404(B). Section 2404(B) reads:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident.

■ ¶ 37 In this case, the trial court admitted the evidence of the prior robbery to show that the identity of one of the robbers involved in the charged robbery was Williams. Identity can be proven by a highly peculiar method of committing a crime. *Driskell v. State,* 1983 OK CR 22, ¶ 25, 659 P.2d 343, 349.

In past cases, this Court has allowed evidence of other crimes or bad acts to be admitted under the "plan" exception of § 2404(B) where the methods of operation were so distinctive as to demonstrate a visible connection between the crimes. *Aylor v. State,* 1987 OK CR 190, ¶ 5, 742 P.2d 591, 593. In addressing the admissibility of such evidence, we have found it is relevant in determining the guilt or innocence of the accused when the peculiar method of operation is so unusual and distinctive as to be like a signature. *Eberhart v. State,* 1986 OK CR 160, ¶ 23, 727 P.2d 1374, 1379; *Johnson v. State,* 1985 OK CR 152, ¶ 4, 710 P.2d 119, 120; *Driver v. State,* 1981 OK CR 117, ¶ 5, 634 P.2d 760. Even though this Court has allowed such evidence under the "plan" exception, this exception is not the most accurate because it deals primarily with the admission of other crimes evidence to show the commission of one crime facilitated another. *See Jones v. State,* 1995 OK CR 34, ¶ 52, 899 P.2d 635, 649, *cert. denied,* 517 U.S. 1122, 116 S.Ct. 1357, 134 L.Ed.2d 524 (1996); *Luna v. State,* 1992 OK CR 26, ¶ 8, 829 P.2d 69, 72. However, in *Eberhart,* we recognized that distinctive methods of operation are relevant to prove the identity of the perpetrator of the crime. *Eberhart,* 1986 OK CR 160, at ¶ 23, 727 P.2d at 1379–80. Identity is the more appropriate label for such signature evidence because distinctive methods of operation are indicative of who perpetrated the crime.

*Welch,* 2000 OK CR 8, ¶ 11, 2 P.3d at 366.

■ ¶ 38 Evidence that the defendant committed another crime is admissible to show identity under the common scheme or plan exception when the previous crime prepares the way for another and the second crime is dependent on the commission of the first. *Jones v. State,* 1989 OK CR 66, ¶ 15, 781 P.2d 326, 329 (upholding the introduction of earlier abuse crimes against the same victim).

■ ¶ 39 Identity is one exception which would also allow evidence of one crime, because evidence from one crime shows up at another crime. For example, in *Warner v. State,* 1977 OK CR 257, ¶ 9, 568 P.2d 1284, 1286, evidence that a particular firearm was recovered at a robbery scene where the defendant was apprehended was admissible to show that the defendant committed an earlier home invasion robbery where that particular firearm was stolen. No highly peculiar method of operation was discussed. The pistol merely tied the defendant to the charged robbery.

■ ¶ 40 Here the State gave the defendant notice of its intention to use evidence of the prior bank robbery by filing a notice and brief in support of the introduction of other crimes evidence. The State urged several theories of admissibility. The State first argued that the prior robbery provided Williams with knowledge about the bank which could be utilized during the second robbery. The State also argued that the prior successful robbery provided motive— showing he's going back to a successful target. Finally, the State argued that evidence of the prior robbery proved the identity of the defendant as one of the robbers in the charged robbery. The State claimed that sufficient similarities existed between the two robberies to create a nexus between them.

¶ 41 Here, the issue is whether there is sufficient connection between the two crimes. The major similarity in these two crimes is the bank itself. It is not every day that a bank is robbed, especially one that is tucked away on the second floor of a garden-style

office building with no quick and easy entry and exit.

¶ 42 Along with the bank itself, other similarities exist. In both robberies, the same .40–caliber semi-automatic pistol was used. The robber in both instances wore a hooded sweatshirt. In both instances the robber attempted to hide his face, first with sunglasses and a T-shirt, next with a stocking cap with eye holes. There is evidence that in both robberies, the robber left the second floor by jumping from the second level, over a railing, down to the first level, bypassing the elevator. Although some of these similarities may exist in any number of bank robberies, all of the similarities taken together point to a common method of operation.

¶ 43 This Court has considered this very issue, in other robbery cases. In *Pickens v. State,* 1988 OK CR 35, 751 P.2d 742, the defendant was charged, in Creek County, with robbing a Zip Trip convenience store with a firearm. Two weeks later, the defendant was apprehended after a robbery had been committed at a convenience store in Tulsa County. Evidence of the Tulsa County robbery was admitted to show that the defendant was also responsible for the Creek County, Zip Trip robbery. This Court held that the similarities—the robber wore the same mask and carried the same shotgun— were sufficient to "prove the identity of the perpetrator...." *Id.,* ¶ 3, at 743.

¶ 44 This Court should not be in the business of weighing the similarities against the dissimilarities. When there are enough similarities between the two crimes to support the trial court's decision, then we must give deference to the trial court's decision. Once that threshold is met, any differences in the two crimes go to the weight of the evidence and not to the admissibility.

¶ 45 An important aspect of this issue is whether Williams' choice to testify and admit that he committed this prior offense causes this issue to be waived. *See Lougin v. State,* 1988 OK CR 21, ¶ 7, 749 P.2d 565, 567 (a defendant cannot complain about evidence that he has also presented to the jury). The parties do not discuss this aspect of this issue in their briefs.

¶ 46 Williams' defense was that he did indeed commit this earlier robbery and told Alvin and Chris Jordan about the robbery. The defense inferred that Alvin Jordan must have used this information and robbed the bank with someone else, and that Beverly Jordan must be lying to protect Chris and Alvin Jordan.

¶ 47 Williams testified that he committed the May robbery. He admitted that he used the .40–caliber pistol (State's exhibit 88) during the May robbery. He admitted that he jumped from the second floor down to the first floor. He admitted that he threatened Josh Robey with the pistol on May 11. He admitted that he left the envelope, which contained his fingerprints, at the bank. His own testimony introduced the evidence he now complains about, but because we have found the evidence admissible, we make no finding regarding the issue of waiver.

¶ 48 In this proposition, Williams also complains about the introduction of a silver watch that contained his DNA. This watch was found in Tarina Clark's apartment, on top of the refrigerator. He further claims that the relevance of this evidence was substantially outweighed by the danger of unfair prejudice. He claims that the only relevance would be to place him in Tarina Clark's apartment, which he readily admitted. The introduction of this watch was relevant to corroborate Clark's testimony that Williams had been in her apartment.

¶ 49 However, in cross-examining Williams, the prosecutor asked him if he knew the watch was stolen. There was no objection to this question. This amounted to other crimes evidence, which Williams now complains about. Given the testimony that just about everything that Williams owned was stolen, we find that the introduction of testimony that this watch was stolen did not rise to the level of plain error.

### B.

¶ 50 In proposition three, Williams contends that evidence concerning the amount of money in his pocket during the traffic stop after the robbery was the product of an illegal search, thus inadmissible. Williams

preserved the issue by filing a motion to suppress, participating in a suppression hearing, and making a contemporaneous objection at the time evidence regarding this money was introduced.

¶ 51 The facts leading to the discovery of this money are simple enough. During a suppression hearing, the facts were established that at about 10:30 a.m. the morning after the robbery, Officer Mark Kennedy saw Williams' white Chevrolet Camaro drive through a stop sign and strike another car in the side. Williams turned the corner and drove away from the accident scene. Kennedy, who was driving a plain white unmarked police car, attempted to stop Williams.

¶ 52 Williams drove for about a half a mile after Kennedy had activated his "emergency equipment." Kennedy testified that during this time, Williams and the passenger kept looking back at him. Kennedy thought Williams might attempt to elude. Once Williams stopped, Kennedy stopped about two car lengths behind and exited rapidly, because he thought Williams might flee on foot. Kennedy ordered Williams out of the car, and Williams got out and started walking toward Kennedy very rapidly "acting very abrupt and very nervous." At first, Williams had his hands in his pockets, and then Williams wouldn't keep his hands still.

¶ 53 Kennedy placed Williams against his car and conducted a pat-down search for weapons. Kennedy felt a hard bulge of about four inches square in Williams' front right pocket. Kennedy reached in the pocket and pulled a large sum of cash, which was folded in two. Kennedy testified, during the suppression hearing, that he thumbed through the money, but did not count an exact amount. He estimated that there was over $1000. Kennedy asked him about the money and Williams said he had sold a car. Kennedy issued three citations to Williams: failure to stop at a stop sign, driving without a license, and failure to carry proof of insurance. These facts were undisputed at the suppression hearing.

¶ 54 The trial court ruled that the initial stop was lawful and that Kennedy had sufficient articulable suspicion to conduct a pat-down. The trial court found that Kennedy acted reasonably when he thought the wad could be a weapon. The trial court also ruled that the questioning about the money was not a violation of the right against self-incrimination.

¶ 55 At trial, on direct examination, Kennedy testified that there was about $1100. Defense counsel asked Kennedy if he remembered testifying in the suppression hearing that he did not count the money. Kennedy testified that he did briefly count the money with police detective Glen Moore.

¶ 56 After Kennedy had testified, the trial court concluded that it would have suppressed testimony about the counting of the money, as the danger of weapons had passed. The jury was admonished to disregard Kennedy's testimony about counting $1000. "In other words, as though he had not said that he had counted money as though he had not said that it was a thousand dollars.... [Y]ou are to disregard that portion of his testimony." Williams testified that he had about $500 and some change in his pocket. He testified that the money came from the sale of Dyra Malone's 60–inch television, which he sold for $850.

¶ 57 Williams now claims that the initial pat-down search was unreasonable, and if found to be reasonable, the counting of the money exceeded the scope of the pat-down search. In our review of this issue, "we defer to the trial court's factual findings unless those findings are clearly erroneous.... The ultimate conclusion drawn from those facts is a legal question we review *de novo*." *Seabolt v. State*, 2006 OK CR 50, ¶ 5, 152 P.3d 235, 237. *See Ornelas v. United States*, 517 U.S. 690, 691, 116 S.Ct. 1657, 1659, 134 L.Ed.2d 911 (1996) (legal conclusions are reviewed *de novo* ).

¶ 58 We initially find that the officer's decision to conduct a pat-down was reasonable under the circumstances. He had just observed a traffic accident. Williams was acting excited and did not readily comply with demands to show his hands. We further find that the officer was justified in entering Williams' pocket to seize the square-shaped hard object that he thought might be a weapon, but which turned out to be money.

We find no fault in the officer counting or estimating the large amount of money for several reasons. First, for his safety against allegations of theft, the money had to be accounted for once it was in the officer's hands. Second, such a large amount further raises more articulable suspicion and justifies further investigation. Third, the officer indicated that he suspected and knew that there might be razor blades hidden within the money.

¶ 59 We conclude that the trial court did not err in allowing evidence regarding the money. Furthermore, the admonition to the jury to disregard the exact amount found cured any potential error. *See Banks v. State*, 2002 OK CR 9, ¶ 46, 43 P.3d 390, 402 (admonition generally cures error).

### C.

¶ 60 In proposition four, Williams claims that error occurred when the prosecutor exceeded the scope of cross-examination during the re-direct questioning of Dyra Malone. Trial counsel did not object to this questioning of Malone, thus any error is waived unless the error constitutes plain error affecting substantial rights. 12 O.S.2001, § 2104.[11]

¶ 61 We first note that the method and extent of the examination of witnesses is left to the sound discretion of the trial court. *See* 12 O.S.2001, § 2611;[12] *Davis v. State*, 2004 OK CR 36, ¶ 30, 103 P.3d 70, 79; *Scott*

*v. State*, 1995 OK CR 14, ¶ 28, 891 P.2d 1283, 1294.

¶ 62 In this case, defense counsel repeatedly asked Malone about her cooperation with the police, and her failure to talk with the defense team, in order to show that she was aligned with the prosecution. On re-direct examination, the prosecution pointed out, through questioning, that Malone had not been totally honest during her police questioning and at prior hearings.

¶ 63 Williams argues that the testimony directly implicated him in the robbery because Malone first told the police that Williams had confessed to her. But Malone testified, on more than one occasion, that Williams did not confess, and she just told the police that he did confessed so she could stay out of jail, and she just made her statement fit what the police had told her about the robbery.

¶ 64 We find that this method of examination did not exceed the scope of cross-examination as it was relevant to show whether or not Dyra Malone was a credible witness and was in direct response to defense counsel's cross-examination. Therefore, there was no plain error here.

¶ 65 Williams claims that once this evidence was introduced, the jury should have been instructed that the evidence could only be used as impeachment evidence, and the jury should have been instructed on the lim-

---

11. Plain error is error that goes to the foundation of the case or which takes from a defendant a right essential to his defense. *Stouffer*, 2006 OK CR 46, ¶ 74, 147 P.3d at 265.

12. 12 O.S.2001, § 2611 reads:

A. Subject to subsection B of this section, the court shall exercise control over the manner and order of interrogating witnesses and presenting evidence so as to:
1. Make the interrogation and presentation effective for the ascertainment of the truth;
2. Avoid needless consumption of time; and
3. Protect witnesses from harassment or undue embarrassment.
B. Any party to a civil action or proceeding may compel any adverse party or person, or any agent, servant or employee of such party or person, for whose benefit such action or proceeding is instituted, prosecuted or defended, to testify as a witness, at the trial, or by

deposition, in the same manner and subject to the same rules as other witnesses, provided that any such adverse party, or the adverse party's agent, servant or employee called as a witness by the opposing party shall be deemed a hostile witness and may be cross-examined by the party calling the witness to the same extent as any opposition witness.
C. Cross-examination shall be limited to the subject matter of the direct examination and matters affecting the credibility of the witness. The court may permit inquiry into additional matters as if on direct examination.
D. Leading questions should not be used on the direct examination of a witness except as may be necessary to develop the witness's testimony. Leading questions should ordinarily be permitted on cross-examination. When a party calls a hostile witness, an adverse party, or a witness identified with an adverse party, leading questions may be used on direct examination.

ited purpose of this evidence. However, Williams, at trial, did not request such an instruction. Thus, again, our review is limited to plain error. We find that the absence of an instruction on Malone's inconsistent statements, used to show bias, did not rise to the level of plain error.

### D.

¶ 66 In proposition five, Williams claims that highly prejudicial evidence, which was not relevant to any issue, was improperly introduced during trial. His first complaint regards the introduction of a silhouette target that Williams had shot while at a firing range. This target was hanging in the condominium of Dyra Malone at the time of the second robbery. Dyra Malone testified that Williams had brought it into the apartment and had hung it on the wall. Williams told her that he had used the target at the range. Malone testified that it was brought into the apartment sometime in May, but she could not remember if it was before or after the first bank robbery.

¶ 67 This evidence was relevant to show that Williams was competent with firearms; that he was prepared to use firearms; and that he was familiar with the concept of shooting at the center mass of a target to maximize the lethal effect. The trial court did not abuse its discretion in allowing this evidence.

¶ 68 Williams next complains that photographs of Tarina Clark's apartment which show nothing more than clutter, were introduced only for the purpose of casting a veil of suspicion over Williams and to distract and confuse the jury. There were no objections to the photographs, even after counsel was asked by the trial court if there were any objections.[13] These photographs were relevant for the jury to understand Tarina Clark's testimony. Williams and his compatriots were at this apartment the night before the robbery. Williams makes no argument that these photographs prejudiced him in any way. There is no plain error here.

¶ 69 Next, Williams complains about the introduction, during the first stage, of two photographs of Amber Rogers' nude body taken at the Medical Examiner's office.[14] Williams claims, for the first time on appeal, that the introduction of the photographs was not relevant, and only served to elicit an improper emotional response. As counsel had no objection at trial, we review for plain error only.

¶ 70 These photographs show the entry and exit of the gunshot wound sustained by the victim. The photographs show the handiwork of the defendant. And while one of the photographs does show surgical sutures, these photographs are relevant because they more closely depict the nature and extent of the gunshot wound on the victim's body than any other evidence available, including the medical examiner's depiction of the wound locations on a chart. *See Myers v. State*, 2000 OK CR 25, ¶ 36, 17 P.3d 1021, 1032. There is no error here.

¶ 71 Williams next complains about the introduction of recordings of the emergency "9-1-1" calls related to this crime. We note that trial counsel did not object to the introduction of these recordings, thus we review for plain error only. We have approved the introduction of 9-1-1 tapes in certain cases where the parties on the tapes testify at trial. *See Stouffer*, 2006 OK CR 46, ¶¶ 114-17, 147 P.3d at 269; *Al-Mosawi v. State*, 1996 OK CR 59, ¶ 56, 929 P.2d 270, 283-284.

¶ 72 The tape contains a call from Donnie Cox to the 9-1-1 operator; a call from the alarm company to the 9-1-1 operator; a call from another woman in the building (Irma Hickman) to the 9-1-1 operator reporting gun shots and screaming; a call from Shelly Martin to 9-1-1 "been robbed and three people are shot;" and a call from Sandra Simmons to 9-1-1 reporting the white car speeding through the parking lot just before the police arrived: "small white older sports car—beat up . . . dark windows."

¶ 73 Most of these calls are occurring soon after the offense and can be described as so

---

**13.** The photographs are State's exhibits 133, 135, 144, and 302-305.

**14.** State's exhibits 223-224.

close to the event to be excited utterances and possibly even present sense impressions. *See Al–Mosawi*, 1996 OK CR 59, ¶ 56, 929 P.2d at 283–284. While these tapes might have been cumulative to the witnesses' testimony, the cumulative effect did not substantially outweigh the relevance contained therein. The introduction of this tape did not rise to the level of plain error.

¶ 74 Next, Williams complains about testimony from Christie Tull about a conversation between herself and Amber Rogers before the robbery occurred. The conversation can be characterized as general conversation between friends or acquaintances about the happenings in their life. At trial counsel argued that the conversation was irrelevant. On appeal, Williams complains that the conversation constituted hearsay testimony and was irrelevant as well.

¶ 75 We find that the relevance argument was preserved and is well founded. Although the State argues that the conversation was permissible to show that Rogers was a normal human being. We find no relevance to this conversation other than to evoke sympathy for the victim, and to show that she was less deserving of death than any other potential victim. We have consistently held that the guilt stage of trial is no place for appeals to sympathy for victims. *Garrison v. State*, 2004 OK CR 35, ¶ 117, 103 P.3d 590, 610–11.

¶ 76 Although the introduction of this conversation constituted error because it was not relevant during the first stage, Williams must show that he was prejudiced by the conversation.[15] Here Williams has not shown that he was prejudiced by the introduction of this conversation in either the first stage or second stage of trial.[16]

¶ 77 Williams' next complaint regards testimony of the surgeons who treated the victims. He first complains that testimo-

ny from the surgeon responsible for the treatment of Amber Rogers was not relevant during the first stage of trial. Williams argues that Dr. Curtis Yeary's testimony should have been limited to the fact that, despite his efforts, Amber Rogers died while being treated, instead of the "step by step" detail of the treatment of Rogers in an effort to save her life.

¶ 78 Williams failed to utter any objections to this line of testimony, thus he must show that the testimony constituted plain error. The State is obligated to show that the death was caused by the criminal actions of the defendant. In order to show that, in this case, the State had to show that Amber Rogers died despite the heroic efforts of the surgery team. There was no plain error here.

¶ 79 Williams also complains about the second stage testimony of the surgeons that treated the other victims who did not die. Again, there was no objection to this testimony, thus we review for plain error only. 12 O.S.2001, § 2104. Here, one of the aggravating circumstances alleged was that Williams created a great risk of death to more than one person. Although, Williams claims that evidence that these two victims were shot was sufficient to show a great risk of death to more than one person, our cases reveal that testimony about the nature and extent of gunshot wounds are relevant for this aggravating circumstance. *See Selsor v. State*, 2000 OK CR 9, ¶ 25, 2 P.3d 344, 352. Therefore, the introduction of this testimony did not go to the foundation of the case or take from Williams a right essential to his defense. 12 O.S.2001, § 2104; *Andrew v. State*, 2007 OK CR 23, ¶ 24, 164 P.3d 176, 188.

**E.**

¶ 80 In proposition seven, Williams claims that the trial court erred in

15. *Smallwood v. State*, 1995 OK CR 60, ¶ 29, 907 P.2d 217, 227 ("This Court has consistently held that it is not error alone that reverses the lower court's judgments, but error plus injury, and the burden is upon the appellant to establish the fact that he was prejudiced in his substantial rights by the commission of the alleged error." [citations omitted])

16. Williams claims that, because the State incorporated all of the first stage evidence into the second stage, he was prejudiced in either or both stages by the introduction of irrelevant evidence during the first stage.

permitting a police officer to give expert testimony for which he was not qualified to give. Here, Officer Jeff Felton testified regarding injuries present on Williams' body at the time he was arrested. Felton testified that Williams had a fresh abrasion on his right wrist and hand area, and he had a laceration on his left shin. Felton was asked if he found the injuries significant. Felton testified that in "[m]eeting with other detectives, it was determined that one of the suspects had fled the bank by jumping off the second floor balcony. These [injuries] just looked like injuries that one might receive by . . . jumping and falling." There was no objection to this testimony, thus we review for plain error only.[17]

¶ 81 The State argues that the testimony was not offered as an opinion, but to show why Felton took pictures of the injury. The State also argues that the testimony was proper lay opinion testimony based on the officer's own investigation.

¶ 82 Opinion testimony is governed by 12 O.S.2001, § 2701, et seq. Opinion testimony may properly come from either lay or expert witnesses. Only expert witnesses may give opinion testimony based on scientific, technical or other specialized knowledge. 12 O.S.2001, § 2701.

¶ 83 In looking at the photographs of the injuries, it appears that it would be impossible for a lay person to determine how these injuries occurred. The injury to the hand and wrist is to the outside of the right wrist and the back and edge of the hand. The injury to the left leg is a laceration to the inside of the left shin. Without some type specialized knowledge, any opinion about the source of these injuries would be pure speculation.

¶ 84 However, we cannot find that the error in the introduction of this testimony rose to the level of plain error. Felton's opinion was not concrete, or definite. His opinion was more akin to a lay person stating a reasonable conclusion based on the perception of Williams' injuries. Felton stated that the injuries might have been caused by jumping and falling—and tied this opinion to the theory of escape. The jury was able to observe the photographs and reach its own conclusion. We do not believe that this testimony went to the foundation of the case or took from Williams a right essential to his defense.

### F.

¶ 85 Williams claims, in proposition eight, that the State presented insufficient evidence to prove that he was guilty of first degree malice murder. He argues that he did not fire the fatal shot and there was insufficient evidence to show that he intended for the shooter to kill Amber Rogers or to show that he knew that the shooter intended to kill Amber Rogers, thus he cannot be guilty of first degree malice murder as an aider and abettor.[18]

¶ 86 The jury was given verdict forms for both theories of first degree murder, malice murder and felony murder, and the jury found Williams guilty under both theories. Pursuant to *Alverson v. State*, 1999 OK CR 21, ¶ 83, 983 P.2d 498, 521, this Court must construe the verdict as one of guilty of first degree malice murder.

17. The evidence supporting the jumping conclusion included debris and plants being disturbed where a person would have landed if he had jumped from the balcony, as happened during the May robbery.

18. According to Appellant's brief, we must determine whether the evidence was sufficient to show that either Williams shot and intended to kill Amber Rogers, or Williams aided and abetted the Rogers' killer with a personal intent to kill or he aided and abetted with full knowledge of the intent of the killer. *See Johnson v. State*, 1996 OK CR 36, ¶ 20 928 P.2d 309, 315. We overrule the language in *Johnson* which indicates this is the proper test and we continue to abide by the general aiding and abetting language. *See Banks v. State*, 2002 OK CR 9, ¶ 13, 43 P.3d 390, 397 ("Aiding and abetting in a crime requires the State to show that the accused procured the crime to be done, or aided, assisted, abetted, advised or encouraged the commission of the crime.") We note that Appellant would even lose this proposition under the *Johnson* test, because his involvement was such that he personally had the intent to kill or knew that his codefendant had the intent to kill, when Amber Rogers was shot.

¶ 87 In *Powell v. State,* 2000 OK CR 5, ¶ 48, 995 P.2d 510, 524, this Court stated that the test for aiding and abetting was as follows:

All persons concerned in the commission of a crime, whether it be felony or misdemeanor, and whether they directly commit the act constituting the offense, or aid and abet in its commission, though not present, are principals and are equally culpable with other principles. *Rounds v. State,* 679 P.2d 283, 286–87 (Okl.Cr.1984); 21 O.S.1991, § 172. Mere presence or acquiescence, without participation, does not constitute a crime. However, only slight participation is needed to change a person's status from a mere spectator into an aider and abettor. *Hackney v. State,* 874 P.2d 810, 814 (Okl.Cr.1994); *McBrain v. State,* 763 P.2d 121, 124–125 (Okl.Cr.1988). "Aiding and abetting in a crime requires the State to show the accused procured it to be done, or aids, assists, abets, advises or encourages the commission of the crime." *Hindman v. State,* 647 P.2d 456, 458 (Okl.Cr.1982).

¶ 88 In our analysis of the sufficiency of the evidence, we view the evidence in a light most favorable to the State to determine whether any rational trier of fact could have found the elements of the offense beyond a reasonable doubt. *See Easlick v. State,* 2004 OK CR 21, ¶ 15, 90 P.3d 556, 559. This test is appropriate here where there was both direct evidence and circumstantial evidence supporting the conviction. *See Spuehler v. State,* 1985 OK CR 132, ¶ 7, 709 P.2d 202, 203–04. An analysis of the facts shows that the evidence was more than sufficient to support the conviction for malice murder.

¶ 89 In this case, the State presented evidence that Williams had the idea of robbing this bank because he had successfully robbed it before. Williams admitted that his guns were used in the robbery. Under the State's theory, the first person shot was customer Smith, whom Williams shot in the back, with the intent to kill. Then Williams shot Poole in the side, again with intent to kill.

¶ 90 The State attempted to argue that Williams fired at Amber Rogers as he was leaving, but the evidence really did not support that theory. It appears that Williams fired three shots. According to the State, he shot Smith twice (once in the back and once in the forehead) and shot Poole once. Three empty cartridges and three live rounds were found in Williams' revolver.

¶ 91 It is clear that he intended to kill at the bank. It is also clear that he knew that his codefendant was armed with a loaded weapon and both of them had spoken of killing, "if they had too," in preparation for this robbery. If he had intended to kill when he shot, how could he not know that his codefendant also shot with intent to kill? These two defendants acted with one accord and the evidence shows that they shot each person with intent to kill.

¶ 92 There was sufficient evidence presented to prove beyond a reasonable doubt that Williams is guilty of malice murder.

## IV. SECOND STAGE ISSUES

### A.

¶ 93 Williams claims, in proposition nine, that victim impact evidence was improperly admitted. He first claims that the statements exceeded the scope of allowable victim impact evidence. Second, he claims that the trial court's failure to give the uniform instruction on victim impact testimony constituted reversible error, despite a failure to request the instruction by trial counsel.

¶ 94 Addressing the failure to give the uniform jury instruction on victim impact evidence, OUJI–CR 2d 9–45 (1996), we held that the failure to give this instruction is not always fatal. *See Powell,* 2000 OK CR 5, ¶ 121, 995 P.2d at 535; *Thornburg v. State,* 1999 OK CR 32, ¶ 34, 985 P.2d 1234, 1246. Other than his argument that the victim impact testimony exceeded the scope of admissible victim impact evidence, Williams has not shown how the lack of an instruction caused him to receive a sentence not supported by the evidence. *Id.* The victim impact evidence was proper and was not fraught with the type of emotional content

that would cause the jury to totally ignore mitigating evidence. Failure to give the instruction was not so serious as to deprive Williams of a fair trial, with a result that was reliable.

¶ 95 The victim impact evidence in this case came through three different witnesses, Amber Rogers' husband, sister and mother: Bryan Rogers, Brecka Bagby and Deborah Mizell. Williams' complaint is that the witnesses were allowed, over objection, to testify about the impact of the death on other family members. Each witness read prepared written statements which were examined by trial counsel and objections were lodged to certain portions of the statements.

 ¶ 96 This Court has stated that both "victim impact statements" and "victim impact evidence" are admissible in a capital sentencing procedure. This includes a victim's rendition of the "circumstances surrounding the crime, the manner in which the crime was perpetrated, and the victim's opinion of a recommended sentence." *Dodd v. State*, 2004 OK CR 31, ¶ 95, 100 P.3d 1017, 1044; see 22 O.S.2001, § 984. Section 984 reads in part:

> "Victim impact statements" means information about the financial, emotional, psychological, and physical effects of a violent crime on each victim and members of their immediate family, or person designated by the victim or by family members of the victim and includes information about the victim, circumstances surrounding the crime, the manner in which the crime was perpetrated, and the victim's opinion of a recommended sentence. . . .

 ¶ 97 However, evidence may be introduced that "is so unduly prejudicial that it renders the trial fundamentally unfair" thus implicating the Due Process Clause of the Fourteenth Amendment. *Lott*, 2004 OK CR 27, ¶ 109, 98 P.3d at 346, *quoting Payne v. Tennessee*, 501 U.S. 808, 825, 111 S.Ct. 2597, 2608, 115 L.Ed.2d 720 (1991).

 ¶ 98 The issue here is whether an immediate family member can both testify on their behalf and represent other members of the immediate family. "Members of the immediate family" means the spouse, a child by

birth or adoption, a stepchild, a parent, or a sibling of each victim. 22 O.S.2001, § 984.

¶ 99 In *Lott*, two members of the immediate family testified—the victim's son and daughter. Another witness also testified— the victim's granddaughter who was a "representative." She testified about the impact of the death on the entire family (even though she was not a member of the "immediate family"), her father and her aunts and uncles. (Her father and one of her aunts were the two witnesses who also presented victim impact evidence).

¶ 100 In *Hooks v. State*, 2001 OK CR 1, ¶ 37, 19 P.3d 294, 313, this Court held that a family member can give victim impact testimony on behalf of several immediate family members, as long as that testimony is otherwise admissible. Here Deborah Mizell testified about the impact on her grand daughters, who were the victim's nieces. She stated that Amber's family and friends have suffered greatly since Amber's death. Bryan Rogers stated that Amber took a job at a Mental Health Facility and made a difference in so many people's lives. Brecka Bagby stated that her two twin daughters idolized Amber. Counsel objected to these statements as well as statements concerning discussions with Amber over her fear after the first robbery.

¶ 101 While some of the people mentioned in these statements were not immediate family members, portions of the statements can be read to show how the immediate family members' interaction with others outside the immediate family was impacted by the death. The remainder of the statements gives a brief glimpse into the life of Amber Rogers and the circumstances surrounding the crime, which included her fear of a second robbery. All of this is clearly admissible. There is no error in the victim impact evidence in this case.

**B.**

¶ 102 In proposition ten, Williams claims that the instructions defining mitigating evidence were insufficient. He argues that the trial court's instruction which defines mitigating evidence as factors which "in fairness,

sympathy, and mercy, may extenuate or reduce the degree of moral culpability or blame" impermissibly narrows the characterization of mitigation. He claims this definition excludes evidence about a defendant that may warrant a sentence less than death, because the evidence may not lessen his moral culpability or blame. The trial court rejected trial counsel's requested instructions.

¶ 103 The trial court gave the Oklahoma Uniform Jury Instruction OUJI–CR 2d 4–78 (1996) over objection by trial counsel. The trial court also gave OUJI–CR 2d 4–79 (1996), which included a list of mitigating evidence and additional instructions which allowed the jury to consider other mitigating circumstances, if found to exist. This Court has previously analyzed these instructions and determined that they are appropriate. *Rojem*, 2006 OK CR 7, ¶¶ 57–58, 130 P.3d at 299. This Court will not revisit the issue here.

### C.

¶ 104 In proposition eleven, Williams claims that Oklahoma's "continuing threat" aggravating circumstance is unconstitutional. Williams recognizes that we have consistently rejected this claim, but urges this Court to reconsider our position. Williams has cited no new case law which would cause this Court to reconsider our previous holdings.[19] Therefore, this proposition must fail.

### V. PROSECUTORIAL MISCONDUCT

■ ¶ 105 In proposition six, Williams claims that the prosecutor committed misconduct during several phases of the trial, especially during closing arguments. He first claims that the prosecutor expressed his personal opinion of guilt during the first stage closing argument, because he failed to preface part of his argument with phrases such as "the evidence showed." Williams failed to lodge an objection to these comments; therefore, we review for plain error only.

¶ 106 During the last portion of the second closing argument, the prosecutor stated,

"[Y]our verdict is to speak the truth. What's true is this defendant is guilty of murder.... They're guilty. He's guilty. And he's guilty beyond a reasonable doubt."

¶ 107 Any prosecutor is usually going to tell the jury what he thinks the evidence showed. If his argument is reasonably based on the evidence, there should be no error. Here, the prosecutor is not telling the jury to abandon its duty and convict based on the prosecutor's own opinion. He is simply telling them that the evidence supported a guilty verdict. *See Banks*, 2002 OK CR 9, ¶ 43, 43 P.3d at 402. This argument did not constitute error.

■ ¶ 108 Next, Williams complains that the prosecutor presented facts not in evidence during both stages of trial. His first claim revolves around the cross examination of Williams, when the prosecutor asked if he knew the watch, bearing his DNA, was stolen. There was no objection to this line of questioning. He argues that this questioning presented facts not in evidence and presented other crimes evidence. The questioning did not present facts not in evidence because, during cross-examination, the parties are allowed to ask leading questions which are based in fact. Because there was no objection, the basis of the question was not challenged. Thus this review is waived. The presentation of other crimes evidence was addressed in proposition one and found not to constitute plain error. No different result will be reached here.

¶ 109 Williams claims that during first stage closing argument, the prosecutor argued facts not in evidence when he suggested that when Williams was talking to Alvin Jordan about the prior robbery, he was actually planning a future act. There was an objection and the trial court reminded the jury that they would recall what the evidence was. Actually the prosecutor was pointing out that Williams stated that he would kill if he had to, which infers a future act.

■ ¶ 110 Williams also claims that the prosecutor's argument indicating that he was

---

19. *McElmurry v. State*, 2002 OK CR 40, ¶ 84, 60 P.3d 4, 24–25; *Myers v. State*, 2000 OK CR 25, ¶¶ 70–74, 17 P.3d 1021, 1036–37.

the leader of the robbery team was not based on the evidence. There was no objection to this argument. The prosecutor pointed out that Williams robbed the bank before, presented the robbery to the other two, and was the first to shoot. Furthermore, evidence showed that Williams' car was used as the get-away car, and he had control of the firearms used in the robbery before and after the robbery. These "leadership" arguments were reasonably based on the evidence, thus there was no error here. See *Washington v. State*, 1999 OK CR 22, ¶ 42, 989 P.2d 960, 974.

¶ 111 Next, Williams complains, for the first time on appeal, that the prosecutor made claims that the .45–caliber bullet found at the bank indicated that Amber Rogers was caught in a cross fire between Williams and Jordan. Actually, the .45–caliber bullet was not positively matched to Williams' gun, but it might be deduced that no other .45–caliber pistols were fired in the bank besides Williams' pistol. The assertion that Amber Rogers was caught in a cross-fire is not based on the evidence, because the evidence indicated that Rogers was shot as the robbers were leaving the bank. Expert testimony indicated that the .45–caliber bullet's trajectory was from the entry way of the bank.

¶ 112 If the prosecutor's argument was that there were bullets flying during the robbery and Rogers had no protection or defense, then that is probably true. Based on the entire argument, we cannot say that these comments rose to the level of plain error.

¶ 113 Williams complains because the prosecutor stated that "we know" that Williams was the man in black. The argument was based on the black "Fubu" shoes recovered and the prints left on the counter. There was no objection to this argument. We find that this argument was reasonably based on the evidence, thus there is no plain error here.

¶ 114 During the second stage argument, Williams complains about the prosecutor's argument, which stated that Williams procured ammunition for the guns. An objection to this statement was overruled. This argument was part of the overall argument that Williams was the leader. The prosecutor pointed out the planning and preparation necessary to commit this robbery; knowledge of the bank's layout; obtaining clothing; and obtaining guns and ammunition. The prosecutor's statement that, "He had to buy or obtain bullets for the guns" was based on the fact that the guns were his guns and they were loaded. It was a pretty broad statement and we find any potential error in the statement was harmless.

¶ 115 Williams again complains that the prosecutor made unequivocal statements that Williams' car was the get-away car. The fact that a similar car was leaving the scene at a rapid pace provided a reasonable basis for the argument. He also complains about a statement that both Williams and Jordan shot at Amber Rogers as they were leaving the bank. An objection was overruled. Again we find this was not based on the witnesses' testimony, but the surveillance photographs show both robbers pointing guns at Rogers, and the .45–caliber bullet found in the wall behind where Rogers was standing. Even if the statement is not reasonably based on the evidence, this argument did not affect the sentence of death, thus it is harmless.

¶ 116 Williams next claims that the prosecutor improperly ridiculed him during both stages of trial. He complains that the prosecutor indicated he was a liar by asking what it meant to take an oath and asking if he was a "self-confessed liar." The prosecutor referred to his story to Dyra Malone when he said he "jacked" a white man. Appellant admitted that was a lie to his girlfriend, but he doesn't lie under oath.

¶ 117 Then during the second stage process, the prosecutor asked defense expert Wanda Draper if she knew "that he had lied to us and to this jury and this court this week." This question was an attempt to show that Wanda Draper's information was only based on what Williams had told her, and it could be untrue. There was no objection to any of this questioning.

¶ 118 By the second stage, it was clear that the jury did not believe Williams' story about

having nothing to do with the second bank robbery; therefore, any comment about him not giving truthful information to Draper was a reasonable inference and an admissible tactic to discredit the basis of her report.

¶ 119 In both instances, the prosecutor was attacking the veracity of the witnesses and the credibility of their testimony. The questioning did not amount to plain error.

¶ 120 Williams further argues that the prosecutor's second stage argument that "human life meant nothing to Jeremy Williams" was improper. There was no objection to this statement. This argument was properly based on the evidence in this case, thus it cannot rise to the level of plain error.

¶ 121 Next, Williams argues that the prosecutor improperly attempted to invoke sympathy for the victim during both stages of trial. He first complains that the prosecutor urged the jury to place themselves in the shoes of Amber Rogers by asking them to imagine what was going through her mind before she was shot and by urging them to focus on the life that Rogers is missing out on. Objections to this line of argument were overruled.

¶ 122 The prosecutor basically outlined things that the victim impact witnesses said that Rogers had done in her life, and he told the jury that she would never again get to experience those events. This argument took up only a couple of paragraphs. Lastly Williams complains, for the first time on appeal, that the prosecutors argument that the jury would be devaluing and discrediting Amber Roger's life if they did not assess the ultimate punishment against Williams.

¶ 123 These arguments are troubling in this case. Arguments both for and against a death sentence in any trial are going to be emotionally charged affairs. However, basing the death penalty on the status of the victim is always improper.

"The State should not encourage the jury to impose the death penalty out of sympathy for the victims." This Court has spe-

cifically condemned many of the comments made in second stage, stating "[t]here is no reason for them and counsel knows better and does not need to go so far in the future." ... No amount of mitigating evidence can counter this argument, and if the jury agrees they may not even consider mitigating evidence.

*Le v. State*, 1997 OK CR 55, ¶ 53, 947 P.2d 535, 554–55 [internal footnotes omitted].

¶ 124 Williams cannot show that the jury improperly weighed the mitigating evidence in his case. The prosecutor's arguments were error of the sort that might create a super aggravator; however, the arguments did not create such error in this case. This Court will not grant relief based on prosecutorial misconduct unless the State's argument is so flagrant and that it so infected the defendant's trial that it was rendered fundamentally unfair. *Roy v. State*, 2006 OK CR 47, ¶ 29, 152 P.3d 217, 227.

¶ 125 Williams also claims that the above argument amounted to the prosecutor's personal opinion about the proper punishment. We find that the argument while improper, did not amount to a personal opinion about the proper punishment.

## VI. INEFFECTIVE ASSISTANCE OF COUNSEL

¶ 126 Williams claims, in proposition twelve, that counsel's conduct fell below reasonable objective standards by, first, failing to object or preserve the record for review and, second, by making certain concessions during second stage closing argument. He also complains that counsel was ineffective for failing to object to the prosecutor's arguments during trial, which he pointed out in a substantive proposition.[20]

¶ 127 In order to show that counsel was ineffective, Appellant must show both deficient performance and prejudice. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984).[21] In *Strickland*, the Court went on to say that

---

**20.** See the discussion regarding proposition six.

**21.** The *Strickland* standard continues to be the correct test for examining claims of ineffective

assistance of counsel. *Bell v. Cone*, 535 U.S. 685, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002).

there is a strong presumption that counsel's conduct falls within the wide range of reasonable professional conduct, i.e., an appellant must overcome the presumption that, under the circumstances, counsel's conduct constituted sound trial strategy. *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065.

¶ 128 To establish prejudice, Appellant must show that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine the confidence in the outcome." *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068.

¶ 129 Williams points out that counsel failed to object to the introduction of several pieces of testimonial and real evidence, which he has complained about in several propositions in this appeal.[22] In discussing these propositions of error, we found that either there was no error or that the error did not rise to the level of plain error.

¶ 130 Williams also argues that counsel was ineffective for failing to object to several instances of prosecutorial misconduct which are raised as error in proposition six. We noted that counsel did object to the most egregious instances of misconduct.

¶ 131 We further find that counsel's failure to object to the introduction of certain items of evidence and the prosecutor's alleged misconduct did not rise to the level of ineffective assistance of counsel under the *Strickland* standard.

¶ 132 In the next portion of this proposition, Williams argues that, during the second stage of trial, counsel's concessions regarding the aggravating circumstance of great risk of death of more than one person, constituted ineffective assistance. Counsel stated that "[t]he defendant created a great risk of death to more than one person. I'm not going to lose credibility with you by standing up here and arguing against that. It's there. They proved it." Williams argues that this concession conflicted with Williams' earlier testimony that he was not at the bank when it was robbed and the victims were killed, which makes him out to be a liar.

¶ 133 Williams states that this statement could be read as an acknowledgement of the jury's verdict of guilty in the first stage and a concession to the first stage facts; however, he claims, counsel made further concessions regarding this aggravating circumstance that took any credibility away from Williams. Counsel stated that "I fully acknowledge he was there, he was participating, he took the gun in the bank and we are not trying to excuse that behavior." Williams claims that these statements make it appear that they put a lying client on the stand, thus suborned perjury.

¶ 134 We have found that these types of tactical decisions do not amount to ineffective assistance of counsel and, in fact, may constitute reasonable trial strategy. *See Malone v. State,* 2007 OK CR 34, ¶ 72, 168 P.3d 185, 214; *also see Turrentine v. Mullin,* 390 F.3d 1181, 1205–06 (10th Cir. 2004) and *Turrentine v. State,* 1998 OK CR 33, ¶ 89–90, 965 P.2d 955, 979–80. When an attorney, during the second stage, punishment phase, admits his client is guilty of crimes for which he was convicted during the first stage, no due process violation occurs. *Jackson v. State,* 2001 OK CR 37, ¶ 30, 41 P.3d 395, 401, *also see Brown v. Dixon,* 891 F.2d 490, 499–500 (4th Cir.1989),

¶ 135 In *Pavatt v. State,* 2007 OK CR 19, ¶ 72, 159 P.3d 272, 293, we noted that in bifurcated trials, "the defendant and his counsel must eventually abandon the fight over guilt or innocence, accept the jury's verdict on that score, and move on to arguments related to punishment." This was exactly counsel's purpose. Counsel argued vigorously for "that man's [Williams'] life" as she put it. Counsel conceded one aggravator out of the three alleged. The jury found the one she conceded and one other.

¶ 136 Counsel argued that, even if the jury found the aggravating circumstances, they were not obliged to "give this man death." Counsel argued correctly that "if you believe that there is even one tiny speck of reason to save this man's life, it's up to you individually and you can do it individually." Counsel told

22. See our discussion of propositions one, three, five and seven.

the jury that if one of the jurors holds its ground against death, Williams would get life without parole. Counsel's argument was an argument for mercy. Based on counsel's complete closing argument, we cannot say that counsel's concessions amounted to ineffective assistance.

## VII. CUMULATIVE ERROR AND MANDATORY SENTENCE REVIEW

¶ 137 After reviewing this entire case, we find no individual error which requires reversal. Even when we view these alleged errors in a cumulative fashion, we find that no relief is required, thus Williams' cumulative error claim must fail. *Woods v. State*, 1984 OK CR 24, ¶ 10, 674 P.2d 1150, 1154.

¶ 138 We find that there is sufficient evidence for the aggravating circumstances found by the jury: (1) the defendant created a great risk of death to more than one person; and (2) there exists a probability that the defendant will commit criminal acts of violence that would constitute a continuing threat to society.

¶ 139 Here, great risk of death is clear. The evidence is clear that three people were shot; one died and the other two suffered grievous injuries that might have caused death had they not received medical treatment. *See Dodd*, 2004 OK CR 31, ¶ 106, 100 P.3d at 1048. Evidence of continuing threat was proven by Williams' commission of an earlier armed robbery at this same bank. *See Harris v. State*, 2007 OK CR 28, ¶ 14, 164 P.3d 1103, 1110.

¶ 140 We can say, beyond a reasonable doubt, that the jury's verdict was not born under the influence of passion, prejudice or any other arbitrary factor, and the evidence supported the jury's findings of the aggravating circumstances. *See* 21 O.S.2001, § 701.13. Due to Williams' arguments in proposition eight, we find it necessary, out of an abundance of caution, to state that Williams is eligible for the death penalty because he aided and abetted in first degree malice murder.[23]

¶ 141 Williams presented mitigating evidence, which was summarized and listed in an instruction to the jury. In addition, the trial court instructed, that the jury could decide that other mitigating circumstances exist and they could consider them as well. Obviously the jury chose to find that, even with the mitigating evidence, Williams should be sentenced to death, we agree.

¶ 142 We find no error warranting reversal of Williams' convictions or sentences; therefore, the Judgments and Sentences of the trial court are, hereby, **AFFIRMED.**

LUMPKIN, P.J., C. JOHNSON, V.P.J., A. JOHNSON, J.: concurs.

CHAPEL, J.: concurs in result.

---

**23.** Even if Williams had only been convicted of felony murder, he would still be eligible to receive the death penalty because he was a major participant in this crime, and he exhibited a reckless indifference to human life, even to the point of shooting victims with intent to kill. *See Tison v. Arizona*, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987); *Enmund v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982). In *Tison*, a felony-murder case in which the defendant himself did not kill, the Supreme Court held that a defendant who did not actually commit the act which caused death, but who was a major participant in the felony and who had displayed reckless indifference to human life, may be sufficiently culpable to receive the death penalty. 481 U.S. at 158, 107 S.Ct. at 1688. *Tison* modified the Supreme Court's holding in *Enmund v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), finding that the Eighth Amendment forbids the imposition of the death penalty on "one ... who aids and abets a felony in the course of which a murder is committed by others but who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed." *Id.*, 458 U.S. at 797, 102 S.Ct. at 3376.